25 N.J. Super. 50 (1953)
95 A.2d 446
JOSEPH SIMON, PETITIONER-APPELLEE,
v.
R.H.H. STEEL LAUNDRY, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Hudson County Court Law Division.
Decided February 13, 1953.
*53 Mr. Mortimer Wald, attorney for petitioner-appellee.
Messrs. Shaw, Hughes & Pindar, attorneys for respondent-appellant (Mr. Robert Shaw, of counsel).
DREWEN, J.C.C.
This is an appeal from an award of workman's compensation. The accident claimed to be the cause of the injury alleged occurred some 13 years ago. The original claim proceedings, instituted in 1940 and resulting in a settlement approved by the Bureau, is one of the subjects of contention on this appeal. After the definitive hearing now before us, held March 26, et seq., 1952, the deputy director found 65% of total and permanent disability and awarded compensation accordingly. The injury as claimed is a disabling psycho-neurosis, without physical or neurological injury. It follows that in the nature of things injury and disability here are one and the same.
Petitioner had been in respondent's employ as assistant steam engineer for a period of some 12 years, when on October 25, 1940 a high pressure steampipe burst in the boiler room where he was at work. The testimony having reference to it is such that I deem it fair to regard the explosion as violent and terrifying. Respondent's witness Colicchio says he found entry to the boiler room, immediately after the explosion, impossible because of the heat of the escaping steam. Denehy, another witness for respondent, and who was with petitioner when the accident occurred, testified in part, on cross-examination:
"Q. Your nerves went after that explosion?
A. Yes. Ever since that I get too nervous, get upset too easy, you know.
Q. You were always in good health before?
A. Yes, I was."
*54 And also:
"I can't be a fireman no more. You have to have good nerves for that you know."
An incident of the explosion was the death of petitioner's immediate superior, one Christiansen, who, in attempting to enter the boiler room through a cellar window, suffered a heart attack and died before medical aid could be summoned. There is no direct proof that petitioner witnessed Christiansen's death, but he very soon learned of it, and I judge it fair to assume that it became an added factor in the psychic impact of the experience. At the first hearing in 1941 petitioner gave his own immediate reaction:
"There was a terrible explosion knocked me like somebody grabbed me and knocked me down. I lost my mind in a second. When I wake up I see there was all steam and I tried to escape from the steam. I see the exit and I tried to get out."
And again on the present hearing:
"Q. When this pipe exploded what happened to you?
A. I don't know anything, because I just was unconscious. I can't remember. When I wake up I see I was terrible, just like in a mine, I see like in a door, exit door. I start walk away."
On both sides there is testimony by specialists in neuro-psychiatry. To an important extent there is agreement between them. Respondent's Dr. Blumberg and petitioner's Dr. Stockfish both say that the disability is total. It is not disputed that he is physically able to work, nor that the remedy lies in making the inducement to work more compelling than the inducement to remain disabled. Yet all the doctors say the condition is an illness, and one that requires skilled professional treatment. Petitioner's expert finds that the accident was the "acute precipitating factor" causing his present "severe state of psycho-neurosis." One of respondent's experts lays it to a paranoid condition brought about or aggravated by a dispute over assigned work following *55 the explosion and complicated by emotional disturbances and paranoid trends allegedly having their origin prior to the accident. Another of respondent's experts says there can be no telling how the disability was caused, without a protracted period of conditioned observation in a hospital. And there is also scientific exposition at some length of the desirability and curative effect of compelling the patient to rely on his own resources by denying to him all others, a dictum that is met, notwithstanding it may be perfectly sound, by the simple fact that judgment in workman's compensation cannot be a means of therapeutic discipline, as such.
Petitioner continued to work for about five days after the explosion, when, as respondent says, he was "laid off," but as petitioner says, "Not laid off, I couldn't move any more. I couldn't get up from the bed. * * * I couldn't get up no more." About three months later he returned to work, but had to leave after several days because he found the work assigned him, that is laboring work, too difficult. He has not worked since.
True, there are some things in petitioner's record of employment that might indicate a predisposition to undue psychic or emotional shock. But as already mentioned, they were not such as to disable him from doing his work so as to continue in respondent's employ. There was an occasion in 1936 when he was out for a considerable time due to an illness that culminated in an appendectomy; in 1940 he had a leave or "vacation" of three months, upon his return from which he felt greatly benefited and resumed his work with apparent satisfaction, until the time of the accident. Upon this question of prior qualifications of health, and of freedom from physical defects and disabilities in the workman, see Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54 (App. Div. 1950); Bernstein Furn. Co. v. Kelly, 114 N.J.L. 500 (Sup. Ct. 1935), affirmed 115 N.J.L. 500 (E. & A. 1935); Vandenberg v. John DeKuyper & Son, 5 N.J. Super. 440 (App. Div. 1949).
It must be admitted that the intangibles in a problem of this kind present difficulties indeed. But inherent *56 perplexities cannot be permitted to defeat an award where the requisite standards of proof have otherwise been met. Respondent has from the very beginning sought to attribute the disability to causes for which it is not legally responsible. That contention casts the burden of proof upon it. Atchison v. Colgate & Co., 3 N.J. Misc. 451 (Sup. Ct. 1925), affirmed 102 N.J.L. 425 (E. & A. 1926). Petitioner's passing from a state of comparative health to a sudden and prolonged period of disability is itself a strong probative circumstance when the point of transition is so sharply marked, as here, by the happening of the accident. Kolesnik v. Irvington Varnish and Insulator Co., 120 N.J.L. 8, at p. 12 (Sup. Ct. 1938). As to sufficiency of proof under circumstances like those embodied in the present transcript, see Jackson v. D.L. & W.R.R. Co., 111 N.J.L. 487 (E. & A. 1933); Jackson v. N.Y. Shipbuilding Co., 15 N.J. Misc. 367 (Sup. Ct. 1937); Furferi v. Penna. R.R. Co., 117 N.J.L. 508 (E. & A. 1937).
One of respondent's contentions is that the result of the proceedings had on the first presentation of the claim in the Bureau was such as to render the cause res judicata. Involved in this contention is another  that the present petition is barred by the statute of limitations. The cause was commenced by original petition filed December 11, 1940. It came on for hearing March 11, 1941. In the proceedings that followed the deputy commissioner's approval of a compromise agreement was sought. Testimony was presented and at its conclusion the deputy declared: "The settlement is approved." I think it is of no moment that records and papers relating to the matter are denominated or described in such terms as "rule for judgment" and the like. The plain fact is that the actual occurrence was such as to preclude a consequent final judgment. The provision made was for ten weeks of temporary disability at $20 per week and 7 1/2% of total permanent disability equivalent to 37 1/2 weeks at $20 per week. These payments were made, the last one on November 14, 1941. The present petition was filed March 29, 1951, in which petitioner prayed for an adjudication of his claim *57 on the merits. That the proceedings in 1941 did not result in a final determination on the merits is placed beyond question by the statement made at the time by respondent's counsel, in part as follows:
"Now, insofar as the respondent is concerned, we did deny, and still emphatically deny, that this petitioner suffered any accident at the time, and he suffers any disability as a result of this accident, of this alleged accident. The respondent waives none of its defenses in arriving at this compromise."
The provision of the relevant statute as it stood in 1940 (R.S. 34:15-22) presupposes that no determination is final in which the "amount agreed upon is less or more than the injured employee or his dependents are properly entitled to receive." Considering this feature alone, an examination of the 1941 proceedings shows that in the testimony of petitioner and of Dr. Yolken a disability is indicated clearly in excess of the 7 1/2% allowed by the settlement. Respondent endeavors to distinguish the cases on this subject from the situation before us, but entirely without success, in my opinion. From an examination of these decisions it would seem that the arguments made from time to time for the finality of Bureau settlements have just about exhausted all possible contentions for the establishment of such dispositions as res judicata. P. Bronstein & Co., Inc. v. Hoffman, 117 N.J.L. 500 (E. & A. 1937); Streng's Piece Dye Works, Inc. v. Galasso, 118 N.J.L. 257 (E. & A. 1937); Stroebel v. Jefferson Trucking & Rigging Co., 125 N.J.L. 484 (E. & A. 1940); Ruoff v. Blasi, 117 N.J.L. 47 (Sup. Ct. 1936), affirmed 118 N.J.L. 314 (E. & A. 1937); Nagy v. Ford Motor Co., 6 N.J. 341 (1951). In the last case cited the Supreme Court noted that in the cause before it the employer had denied the "jurisdictional facts," and reserved "all of its defenses" and made the settlement "solely for the purpose of buying peace." And at page 349 the court says:
"This undoubtedly entered into the hearing deputy's conclusion that the settlement approved was `fair'; and that was an alien consideration. A compromise of the compensation allowance proceeding *58 from a denial of liability and jurisdiction is not within the intendment of the legislative grant of power."
This is on all fours with the instant situation and ought to be dispositive. While the cause before the Supreme Court involved a construction of the statute as amended, careful reading of the opinion shows it to be entirely pertinent to the present question.
Respondent also urges laches. In Stroebel v. Jefferson Trucking & Rigging Co., supra, the Court of Errors and Appeals said, at page 487:
"Laches involves more than mere delay, mere lapse of time. To deserve that category the delay must be for a length of time which, unexplained and unexcused, is altogether unreasonable under the circumstances, and has been prejudicial to the party asserting it or renders it very doubtful that the truth can be ascertained and justice administered."
All the cases cited by respondent in this connection were rendered, it is to be noted, prior to the decision in the Stroebel case. But I think the delay here cannot be justly regarded as "unexplained and unexcused," nor as "altogether unreasonable under the circumstances." It might well be that petitioner thought the agreement of 1941 precluded further proceedings. Indeed, his testimony is that he asked the lawyer who represented him at that time to make an effort for additional compensation, and that he was advised by the lawyer that nothing could be done. This testimony is not contradicted. It would, of course, be insufficient to overcome the statute of limitations, but I think it is a reasonable explanation in a matter of laches. Moreover, it does not appear that the delay has prejudiced respondent in its defense of the claim upon the merits. Everything in the case appears to have been fully known to both parties, and the real issues arise from the conflicting inferences to be drawn from the known facts and circumstances.
One of the points urged by respondent is that there is no accident here in the statutory sense, no physical trauma; and that there is "no evidence of any physical disability or *59 impairment of bodily function, * * * petitioner was physically able to work," having "no organic injury to his central nervous system." There is no case, says counsel in effect, where compensation has been awarded based solely on the effects of emotional shock and unrelated to any impairment of physical function of the body or of the organic nervous system. But see Hall v. Doremus, 114 N.J.L. 47 (Sup. Ct. 1934) and Geltman v. Reliable Linen & Supply Co., 127 N.J.L. 487 (Sup. Ct. 1941), affirmed 128 N.J.L. 443 (E. & A. 1942). Entirely apart from decisional authority, however, the statutory basis for a compensation award is an "injury," and there is nothing in the law to exclude from the import of this term such injuries as result from nonphysical, that is, psychic, trauma. I certainly do not understand that any of the specialists giving testimony in the case means to deny that psychic trauma can be incapacitating. Nor do I agree with the statement that the record is without proof of "disability or impairment of bodily function." The pain or impairment that petitioner suffers, while probably not caused by injury or disease in the ordinary sense, is nonetheless real to him. This is the very nature of his illness and of his disability. Respondent's experts do not dispute it. Indeed, as already noted, Dr. Blumberg estimates disability as total and permanent.
There is proof to show that petitioner on a number of occasions made representations of his health that are more or less in conflict with what he now says about it. For example, he is shown to have filled in from year to year blank applications for renewal of his motor vehicle driver's license so as to make it appear that he was free from physical and mental disability. He explains this by saying that he did not think he was crazy. And he adds that in each instance it was not his intention to drive a motor vehicle, his wish being to keep his license in force until he could drive again. I do not regard the matter as of material significance.
On March 3, 1941 he made application for unemployment benefits. The application data included the representation that he was able to work. He collected 12 weeks of unemployment *60 benefits, the maximum to which he was entitled. It is one thing to pass moral judgment on petitioner's conduct in making the representation he did, and quite another to appraise its force in evidentially countervailing the proof of disability. The undisputed fact is that petitioner has been constantly unemployed since the accident in 1940, save only for the brief interval of his attempt to return. As already stated, respondent's own witness, Dr. Blumberg, estimates disability as total and permanent. And Dr. Kinley, for respondent, describes petitioner as one with a "functional neuro-psychiatric disorder * * * a neurosis * * * and he also has a paranoid tendency." In addition, respondent placed in evidence the record of the Elizabeth General Hospital showing that petitioner had been a patient there from December 22 to December 25, 1941, the record diagnosis being "gastric-neurosis." The history taken upon admission to the hospital shows "patient has been bed-ridden the past year, with pain throughout the abdomen, constipation, anoxia and anorexia for the past three months. This has become much worse so that he could not sleep." He was discharged from the hospital as "unimproved." I cannot find that the proof of illness and disability is in any way impaired by the signature of petitioner upon a printed application for unemployment benefits, however questionable his part in the business may have been.
Respondent urges that the deputy director erred in excluding from the evidence the report of Dr. Dowd. Suffice it to say that I have examined this report and considered it fully in appraising the proofs. No harm has come to respondent from its exclusion.
I find that petitioner is totally and permanently disabled as the result, for the greater part, of an accident arising out of and in the course of his employment. But what is the percentage of such disability? The answer to this is involved in another finding, which is that petitioner's condition is affected by a degree of unrelated paranoid trends and that these are chargeable with a portion of his disability, the question being how much. I have made independent *61 effort, as I am required to do, by a careful examination and study of the transcript, to arrive at my own estimate of this unrelated factor and hence of the extent of the total and permanent disability that is chargeable to the accident. So doing, my ultimate determination is the same as that arrived at by the deputy director. The underlying reason for this result I believe to be a compelling one. The weighing of imponderables is something very like a contradiction in terms, yet there can be no estimate of disability here without undertaking just such a task. The problem involves the extensive and complicated theories of disputing specialists in a subject that is at once profound and abstruse. Enough already has has been said to show how far the question is invaded by the refinement of inferences which the experts draw from what they declare to be diverse psychic manifestations. If, upon the ordinary workmen's compensation appeal, this court may apply the familiar rule of deference to conclusions reached by the trier of the facts in his appraisal of the credibility of witnesses and the weight to be given their testimony, certainly in an issue of fact like that before us application of the rule acquires added sanction. Not only was it the indubitable advantage of the deputy director to see and to hear the specialists in their testifying, with all that that imports, but the same thing applies also to the testimony and to the accompanying demeanor of him who is the subject of it all.
I find that petitioner has 65% of total and permanent disability as a result of the accident. Compensation is awarded accordingly.