**349 P.2d 627**

**Roy Lee MURRAY, Sr., Petitioner,**

**v.**

**INDUSTRIAL COMMISSION of Arizona and Benevolent & Protective Order of Elks, No. 385, Respondents.**

**No. 6674.**

Supreme Court of Arizona.

Feb. 24, 1960.

Udall & Udall and Paul G. Rees, Jr., Tucson, for petitioner.

James D. Lester, Phoenix, John R. Franks, Donald J. Morgan, Robert K. Park, and Frances M. Long, Phoenix, of counsel, for respondent Industrial Commission.

YALE McFATE, Judge.

The petitioner, Roy Lee Murray, Sr., on February 7, 1955, while employed as a cook by respondent B.P.O.E. No. 385 (Elks Club at Tucson), slipped on an ice cube and fell, injuring his lower back. He was first attended by Dr. E. J. Nagoda, who sent him to the hospital on April 1, 1955. About May 17, 1955, at Dr. Nagoda's request, he was examined by Dr. Stanley S. Tanz, orthopedic surgeon. Dr. Tanz diagnosed a severe lumbosacral sprain, with possibility of injury to the lumbosacral disc, prescribed medication for pain, back brace, and other conservative treatment. A few days later, petitioner was discharged from the hospital and continued with treatment at home. He

was able to get up and around the house, but was unable to do any type of work because of limitation caused by back pain. He failed to respond to treatment and a myelogram was made. His pains became more severe.

On October 4, 1955, he was examined by a medical board consisting of Dr. Nagoda and three orthopedic surgeons, Doctors Cortner, Tanz and Dixon. At that time, petitioner's medical history indicated that he had felt no relief from the back pain since the injury, although prior thereto he had never experienced any trouble with his back. The board concluded that "Despite the constant defect found in the myelogram, it is very difficult at this time to evaluate how much symptomatology is based on organic disease and how much is based on functional overlay." "Functional overlay" or "functional symptoms" were defined by Dr. Tanz as those symptoms for which the doctor can find no organic basis, such as pain which would be throughout a limb and which would not follow a particular nerve route.

The medical board recommended that petitioner be examined by a neuropsychiatrist, and he was accordingly referred to Dr. Lindsay E. Beaton, who found, among other things, as follows:

"From a psychiatric standpoint, it seems very evident that this man does have a diagnosable hysteria. However, there are neurologic findings in the legs, a positive myelogram, and such very suggestive signs as weakness of the extensor hallucis longus and a paradoxical straight leg raising sign. It seems to me therefore probable that the man's sciatic pain is of organic origin and he may very well have a protruded intervertebral disc * * *."

Dr. Nagoda concurred in the foregoing findings.

On March 5, 1956, petitioner was further examined and evaluated by the Industrial Commission Medical Advisory Board in Phoenix. This board found petitioner was afflicted with a "gross psychiatric disorder," recommended surgery for removal of a protruded intervertebral disc, and a lumbosacral fusion, and stated its opinion that "even with ideal surgical treatment, there may be residual functional symptoms."

On April 26, 1956, petitioner was operated on by Doctors Fonseca and Tanz. A herniated disc was removed and the lumbosacral joint fused. On the following day, after a cottonoid sponge was reported missing, the wound was re-opened and re-explored for the missing sponge, but none was found.

Dr. Tanz, on September 17, 1956, requested the patient be again examined by the Medical Advisory Board at the earliest possible date; that he had been a very difficult psychological problem. A medical advisory board consisting of Doctors Tuveson,

Findlay, Hastings, Saba and Beaton examined petitioner on November 5, 1956, and reported that the patient complained of numbness and burning pains in the right thigh, but found these complaints were purely functional and that "apparently, all his anxiety has been converted into hysterical somatic symptomatology." The board concluded that the fusion was quite stable and " * * * there is no reason why the patient could not become more active, even to the point of returning to some form of gainful occupation which would not involve heavy lifting or straining. He should then be seen by a group of consultants for final evaluation and disability rating in three months following such a period of rehabilitation."

The Commission, on November 19, 1956, ordered petitioner to make a sincere, honest and conscientious effort to obtain light work of such nature as he was physically capable of performing and which he was competent to perform.

On February 15, 1957, petitioner was examined by Doctors Tanz and Cortner, orthopedic surgeons, who concluded that petitioner had sustained a 15% general physical functional disability, and that there existed a severe overlying hysteria. These doctors noted that probably the patient would not be satisfied with a settlement based on 15% disability, but that they could find nothing *objectively* to warrant a greater degree of disability rating.

Dr. Tanz testified at a hearing on July 15, 1957, that various attempts were made to rehabilitate petitioner by way of exercises, increased activity and light work, but such attempts failed because of petitioner's functional, emotional and subjective symptom complex; that with proper rehabilitation petitioner could return to work and do heavy lifting, *if it were not for his functional overlay and emotional attitude toward his injury and physical condition.* On August 22, 1957, the Commission rendered its decision and findings, in effect finding that petitioner sustained a 15% general physical functional disability, and a 34½% loss of earning capacity due to his injury.

Timely protest and petition for rehearing was filed by petitioner contending among other things that he was not mentally able to perform any duties incident to gainful employment.

On May 1, 1958, The Industrial Commission, after rehearing, rendered its decision and made findings and award for unscheduled permanent partial disability, affirming its prior finding of 15% disability and 34½% loss of earning capacity, and finding further that he was able to perform the duties of a watchman, and awarded him $62.77 per month for permanent partial disability, pursuant to subsections C and D, A.R.S. § 23–1044.

The Commission made the following additional specific findings:

"That in determining that the applicant has a reduced monthly earning capacity attributable to his injury by accident, this commission has fully considered the following facts, or additional findings:

"(A) That applicant's occupational history consists of farming, carpenter work, restaurant operator and cook.

"(B) That applicant was 47 years of age at time of his injury by accident on February 7, 1955.

"(C) That applicant has no previous disability.

"(D) That applicant's 15% general physical functional disability is manifested by the objective signs of two operative scars and decreased ankle jerks; that the applicant has multiple subjective complaints which have no organic basis; *that the applicant suffered from a psychoneurosis or hysterical reaction which was not produced or aggravated by applicant's said accident or injury sustained therein, and which would not prevent the applicant from performing the duties of a watchman.*" (Italics supplied.)

Petitioner, by certiorari, seeks to set aside the findings and award on the ground that the uncontradicted medical evidence proves that an existing psychoneurosis or hysterical-reaction was produced or aggravated by the Industrial accident sustained, but nevertheless, was omitted from the Commission's consideration and is not reflected in its award, contrary to law.

At the outset, we are met with the contention of the Commission that the award *includes* disability resulting from the functional overlay. There is no justification for this conclusion. The record shows clearly that the Commission determined that none, of petitioner's disability due to mental disease was compensable. It specifically found that such disease was neither produced nor aggravated by the accident or the injury. Dr. Beaton testified as follows:

"I am sure that fifteen percent physical disability took into account only his back, that is, the physical findings in his back and did not take into account the mental or hysterical findings. And that Dr. Tanz and Dr. Cortner believed that because of his injury and because of subsequent surgery with the fusion that he had a fifteen percent disability. It is generally felt—I say this from having been on many of these consultation boards—that after a man has a fusion that he has a ten or fifteen percent disability."

Likewise, Doctors Tanz and Cortner pointed out that the patient would not be satisfied with a 15% disability because it did not include the overlying hysteria, which they rejected, because the absence of objective findings would not permit a higher rating. In its findings, the Commission

adopted this percentage and likewise adopted the medical conclusion that no causal connection existed as between the injury and the mental condition. Under these circumstances, we do not believe the Commission intended to include disability from hysteria in its 15% disability rating.

Counsel for respondent has referred to certain evidence in the record which he contends shows that petitioner did not make diligent effort to obtain light work after he was ordered to do so by the Commission, and that he lacked a positive and competitive attitude towards obtaining work, and therefore is not in a position to complain about the fact that the Commission did not compensate him for disability resulting from hysteria. In this connection, there was no finding by the Commission that the petitioner failed to cooperate in the matter of seeking light work. He applied for light work, including that of watchman at the Arizona Employment Agency at Tucson, and he likewise applied at service stations, grocery stores and restaurants. He testified he had hunted for light work and had watched the ads in the newspapers and had not been able to find light work. It should be borne in mind that the mechanisms of hysteria in petitioner's case were purely unconscious mechanisms, and that his disabilities and pains were quite genuine to him, and if because of these factors he lacked some of the enthusiasm for work which he might otherwise have had, he should not be penalized therefor.

■ Furthermore, the Commission denied compensation for psychoneurotic disability in this case, not on the basis of failure of petitioner to cooperate, but solely on the ground that such disability was not caused by the injury. Now the argument seems to be that because he is physically able to do light work, he is able to commence a program of self-rehabilitation which will eventually result in his complete recovery from psychoneurotic disability. If an injured workman is legally entitled to benefits by reason of a mental disease, the Commission has no authority to deny him such benefits as a means of enforcing rehabilitation. Simon v. R. H. Steel Laundry, Inc., 25 N.J.Super. 50, 95 A.2d 446.

We now consider the primary issue presented by this appeal, namely, whether the petitioner's psychoneurosis was produced or aggravated by the injury he sustained as a result of the accident, and if so, whether he was entitled to benefits under the Workmen's Compensation Law. In substance, petitioner states the law to be that where there has been an industrial accident causing physical injury, compensable under the Arizona Workmen's Compensation Law, and as a result of that injury the workman develops a disabling psychoneurosis, and where the medical history and medical findings (as distinguished from medical opin-

ions or conclusion) demonstrate that such disability was proximately caused · by the injury, the Commission should take the mental disease into consideration as well as the physical injury, in making the award.

On the other hand, the Commission contends that the question of causal relation between injury and disability is peculiarly and necessarily within the singular knowledge of medical experts, and that their unanimous and uncontradicted opinions with respect to causation must be accepted by the Commission; that petitioner's neurosis is not compensable because although it resulted from circumstances arising out of and following the accident, it was not produced or aggravated by the injury suffered. In order to fairly present the issues it is necessary to set forth and analyze the medical testimony. There were no conflicting findings or opinions with respect to this matter of causation. Dr. Beaton's reports and testimony were the most explicit and are set forth below:

"Hysteria is one of the psychoneuroses, one of the minor mental illnesses; and hysteria is that form of psychoneurosis in which the patient, instead of having sensations of worry and fear and anxiety * * * develops some actual physical symptom. This is what we mean by conversion. This may be a symptom of pain, very likely can be a symptom of · paralysis or loss . of sensation. It is on this basis that the diagnosis of hysteria was made in this man [petitioner]. That is what hysteria is. Hysteria is the conversion of anxiety into a physical deficit of some kind. * * * In my opinion, Mr. Murray definitely feels pain.

* * * * * *

"Q. So if we go back along the pathway of this situation that Mr. Murray is in today we have developing in the two or more years he has been disabled or felt disabled, however you want to look at it, we have developing a neurosis, a hysteria. A. Yes, sir.

"Q. And this develops out of the treatment and out of the situation which arose because of his back injury? A. Yes, sir.

"Q. And back one step further is the injury itself? A. Yes, sir.

"Q. So you have the injury and then a physical manifestation which develops into or is a reason or a stimulus for a mental disability, is that correct? A. That is pretty close to what I would feel. It seems to me you would first have the injury, then the physical symptoms of injury and then you would have all the anxieties and worries that a man develops because of the situation from his injury, then you begin to get neurosis. It is exactly for this reason that I was happy to accept the language that the Supreme Court. of the State

had used, that a neurosis may be traced to circumstances arising out of and following the injury rather than directly to the injury itself * * *.

"Q. Doctor, you feel, however, that if in fact the circumstances arising out of the injury and following the injury are themselves a product of the injury, then to that extent the neurosis developing out of those circumstances is but one step removed from being the product of the injury? A. I have no argument at all with you about it; I say again that medically this is not psychiatrically acceptable.

* * * * * *

"Q. * * * Could you tell us what you do consider as cause for a hysterical condition such as Mr. Murray has? A. I think the basic true medical cause is the dependent, passive, immature configuration of the personality.

"Q. In other words, the man's psychological make up? A. Yes, sir.

"Q. What has influenced his psychological make up? A. Most of the events which took place before the age of twelve.

"Q. That is right. Anything the man has experienced by way of education, by way of events, injury, any emotional— A. To some extent I suppose you could say that psychological make up is a product of everything that has happened to him up to the moment.

"Q. The product of his environment? A. And his constitutional endowment."

In a letter to the Commission dated December 30, 1957, Dr. Beaton stated:

" * * * I have made a diagnosis of a psychoneurosis in this man, and have stated that the type of psychoneurosis is a hysterical reaction. It is my opinion that the accident of which Mr. Murray suffered on 2/7/55 is medically not the cause of his hysterical neurosis. I dislike generally the term 'traumatic neurosis' because it seems to me to infer that trauma is the cause of the neurosis. In company with many other psychiatrists, I prefer the diagnostic phrase, 'neurosis after trauma.' In my opinion no neurosis is ever caused by trauma. Neurosis, by definition, cannot be inherent in physical injury, but is rather inherent in the personality. The neurosis after trauma develops as a result of a reaction of a predisposed personality to personal anxieties that come about as the patient ruminates about his accident. At most, the psychiatrist can say only that the trauma is the occasion which may give specific coloring to the neurosis which does develop. Medically this is not cause; legally, I can conceive that it may be a cause."

As to relation of accident and injury to hysteria, Dr. Beaton further testified as follows:

"Q. Of course, it is true, isn't it, that an accident plays a role in setting up a sequence which produced this end result of disability? A. Certainly.

\* \* \* \* \* \*

"A. If this particular injury had not taken place, this particular set of hysterical manifestations would not be present. If, for example, in Mr. Murray's case, he had not injured his back and had a [ruptured] disk, and had some pain in his leg, he wouldn't now be having back pain and leg anesthesia as symptoms of his hysteria. \* \* \* The symptoms of the hysterical illness take their coloring from the circumstances of the accident. \* \* \* The accident is the first event in a long train of things that happen to the personality that ends up in the hysteria. \* \* \* If that is cause, that is cause; it isn't to me as a physician, cause.

\* \* \* \* \* \*

"Q. Let's go to Mr. Murray's specific case \* \* \*. The injury was the first step in what now results in a hysteria, isn't that correct? A. Yes, I think that is correct.

\* \* \* \* \* \*

"Q. Let me ask you this, can you categorically state that there was no hysteria in February of 1955 existing in Mr. Roy Murray, the date of the accident? A. \* \* \* you mean immediately after the accident?

"Q. Immediately after, yes. A. I can't categorically state it, but I can state it as a reasonable medical opinion, ninety-nine percent.

\* \* \* \* \* \*

"Q. Just one last question, doctor. Would you recommend any psychotherapy or any psychiatry? A. If this man were a private patient?

"Q. Yes. A. Yes."

An analysis of the foregoing evidence and testimony clearly indicates the following factual situation:

(1) The accident and resulting injury played a role in setting up a sequence which produced the end result of mental disability. The accident was the first event in a long train of things that happened to the personality that ended up in the hysteria.

(2) If the injury had not occurred, the neurotic manifestations would not be present. If the back injury had not taken place, this "focus of the anxieties" would not have taken place.

(3) There definitely is a connection between the back injury and hysteria. The illness "takes its coloring" from the accident. Petitioner was a predis-

posed individual, reacting to the stimulus of this particular accident. This industrial accident was the occasion or environmental change in which the hysteria developed.

(4) Petitioner was not afflicted with hysteria or psychiatric disability prior to this accident. There is no evidence that petitioner's neurosis was precipitated by any event in his life other than the accident.

(5) The external stimulus of the accident and injury, acting upon the particular personality with which petitioner was endowed, is the event which started or set off the processes by which that personality developed the hysteria.

To sum up, the injury resulting from this accident was the event which, in a natural and continuous sequence, unbroken by any efficient intervening cause, acting upon the particular personality configuration of this individual, produced the hysteria, and without which this particular hysteria would not have occurred. By definition, that is proximate cause. The injury need not be the sole cause of disability, if it is a producing cause.

In the opinion of the doctors this injury did not "cause" the hysteria from a medical point of view. However, what constitutes proximate cause is a legal question primarily, dependent for its answer on the facts of the particular case. In the field of medicine, opinions of doctors qualified by training and experience as to causation are competent, and in many cases controlling and binding upon the trier of facts; however, when the medical facts on which such opinions are based are clearly shown, and the medical opinion as to causation conflicts with the inescapable legal conclusion, the former must give way to the latter. The difference in the medical and legal concept of cause results from the obvious differences in the basic problems and exigencies of the two professions in relation to causation. By reason of his training, the doctor is thinking in terms of a single, precise cause for a particular condition. The law, however, endeavors to reach an inference of reasonable medical certainty, from a given event or sequence of events, and recognizes more than one cause for a particular injurious result. In the law of torts, it is said that the tortfeasor is not entitled to a perfect specimen upon which to inflict injury. Likewise, in the field of Workmen's Compensation, the employer takes his employee as he is. In legal contemplation, if an injury, operating on an existing bodily condition or predisposition, produces a further injurious result, that result is caused by the injury.

The conclusion herein reached is in harmony with the general law on the subject and prior decisions of this court. In Safe-

way Stores v. Gilbert, 68 Ariz. 202, 203 P.2d 870, 871, this court said:

"The authorities are divided, but the great majority hold that neurosis resulting from an injury received while in the course of employment is compensable."

In Vol. 1, Sec. 42.22, Larsen on Workmen's Compensation, it is said:

"Conversely, when there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic or hysterical symptom, have accepted this rule."

In American Smelting & Refining Co. v. Industrial Commission, 59 Ariz. 87, 123 P.2d 163, a workman was injured by a large amount of rock falling on his shoulders, neck and back. Following medical treatment his left shoulder and arm became practically paralyzed. The Commission found he suffered a post-traumatic hysteria neurosis. It was held that a nervous shock caused by an accident arising out of and in due course of employment is a compensable injury within the meaning of our statute, and that since a shock is a compensable injury, and neurosis is a disease, a hysteria neurosis caused by a shock is a compensable disease resulting from injury.

Respondent contends that any neurosis, to be compensable, must have been produced or aggravated by an *injury* sustained in a compensable accident, and that in petitioner's case his neurosis is entirely the result of circumstances arising out of and following the *accident,* without reference to the injury. Respondent calls attention to the holdings in Phelps Dodge Corporation v. Industrial Commission and Eads, 46 Ariz. 162, 49 P.2d 391, and the American Smelting & Refining case, supra, supporting this contention.

In the Eads case the petitioner had been compelled to run some distance through poisonous gas caused by an explosion, and suffered temporary pulmonary disorders from the effects of the gas, and after the temporary effects had passed away, he suffered a neurosis. However, there was no evidence that the neurosis was caused by an injury received in the accident. In that case we said that if the evidence had shown that the neurosis had been caused by the injury, then the award would have been proper.

In the American Smelting & Refining case, supra, 59 Ariz. at page 94, 123 P.2d at page 166, we pointed out this same distinction, in the last paragraph of the opinion, as follows:

"We reaffirm the law as stated in the Pierce [Pierce v. Phelps Dodge Corp., 42 Ariz. 436, 26 P.2d 1017] and Eads cases, supra, as being the law of Arizona. We think, however, that there is sufficient evidence in the present case from which the commission might have found, as it must have in order to make its award, *that petitioner's neurosis was the result of the traumatic shock which he received,* and was not due to 'a deep-set fear or apprehension of imaginary ailments that might follow as a result of his injury and the deplorable condition in which his family might be left.'" (Italics supplied.)

In the case at bar, the petitioner's neurosis was shown conclusively by the evidence to have been caused by the back injury he received.

A workman covered by the Arizona Workmen's Compensation Law who is physically injured by accident arising out of and in the scope of his employment is entitled to accident benefits in the form of medical treatment and compensation for his disability until he is cured or until his condition is stationary and the permanent effects of the accident are evaluated. If such injury causes a disabling mental disease, he is entitled to the same benefits. The decision and award in this case deprived petitioner of such benefits with respect to his mental disease, and are therefore set aside.

STRUCKMEYER, C. J., and PHELPS, JOHNSON and BERNSTEIN, JJ., concurring.

NOTE: UDALL, Justice, having disqualified himself, the Honorable YALE McFATE, Judge of the Superior Court of Maricopa County, Arizona, was called to sit in his stead and participate in the determination of this appeal.