178 N.J. Super. 571 (1981)
429 A.2d 1063
RAYMOND H. WILLIAMS, JR., PETITIONER-RESPONDENT,
v.
WESTERN ELECTRIC COMPANY, RESPONDENT-APPELLANT, AND COMMISSIONER OF LABOR AND INDUSTRY AS CUSTODIAN OF THE SECOND INJURY FUND, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1980.
Decided March 20, 1981.
*573 Before Judges BOTTER, KING and McELROY.
Rosemary A. Hall and John F. Lynch, Jr. argued the case for appellant (Carpenter, Bennett & Morrissey, attorneys; Thomas L. Morrissey and Arthur M. Lizza of counsel; Ms. Hall and Linda B. Celauro on the brief).
Samuel E. Bass argued the cause for respondent (Freeman & Bass, attorneys).
John J. Degnan, Attorney General of New Jersey, attorney for respondent-respondent (Erminie L. Conley, Assistant Attorney General, of counsel; Allan L. Lockspeiser, Deputy Attorney General, on the brief).
The opinion of the court was delivered by McELROY, J.A.D.
This is a workers' compensation case. Petitioner was employed by appellant primarily as a packer of telephones on an assembly line and as a bench worker in telephone repair. Two petitions were filed in this matter, neither of which mentioned assembly line work stress nor work quota stress of any sort. The first, filed on November 14, 1972, alleged that while "working for respondent, petitioner was exposed to chemicals and fumes causing occupational disease." This paper alleged "disability to nervous system, internal organs, and complications arising therefrom." The second petition, filed November 28, 1972, asserted that petitioner "contracted an occupational disease," omitted reference to chemicals and fumes, and alleged "disability to chest, lungs, nose, throat, hearing and complications arising therefrom." By means of the alchemistic process *574 peculiar to the workers' compensation matters, these 1972 allegations were transmuted by 1975, when the first of 21 hearings began, into a claim primarily centered upon allegations that the exposure of petitioner to the stresses of assembly line work aggravated a preexisting and underlying schizophrenia, thereby giving that mental illness the character of an occupational disease under N.J.S.A. 34:15-31.[1] The judge of compensation, by oral opinion rendered November 3, 1978, adopted this view of the matter and awarded petitioner permanent total disability benefits. The ensuing order for judgment recited that such disability was occasioned because petitioner "was exposed to adverse environment, noise, stress, and tension resulting in an occupational exposure which resulted in occupational diseases in the nature of chronic bronchitis, binaural hearing loss, and schizophrenia with symptomatic alcoholism and anxiety as a result of his occupational exposure to stress and strain of attaining quotas and keeping up with the assembly line, his exposure to lacquer thinners, to fumes, dust, welding fumes and noise...." The employer does not appeal from this entire cluster of alleged exposure and ills, but rather from the major aspect of the award which concerns the question, novel to this State, as to whether mental illness exacerbated by alleged repetitive mental stress or stimuli is compensable. Necessarily, if the answer to this question be, yes, the accompanying inquiry is whether this case meets the applicable standards of proof. We have examined the opinion below and the record presented. Such consideration, guided by the principles which govern our power of review, obliges us to reverse the decision of the judge of compensation. Close v. Kordulak Bros., 44 N.J. 589, 598 (1965).
*575 This case involves application of N.J.S.A. 34:15-31 to its facts. That statute, as it existed in the time frame applicable to this case,[2] provided:
34:15-31. `Compensable occupational disease' defined
For the purposes of this article the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and, conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment.
Precedent to a recitation of the facts adduced below and a consideration of applicable legal principles we will recount some of the medical evidence which describes the nature of petitioner's schizophrenia. We do so because we feel that in order to obtain the substance and true form of this case and to gauge whether work stress was here, in realistic sense and material degree, an aggravating factor of petitioner's mental disease, one must view the evidence ever conscious that we are dealing with the reactions of a schizophrenic to normal job conditions. In short, if what we have is a man who, because he is a schizophrenic, has a purely subjective reaction to his job (as indeed, he *576 may react to all other aspects of life), we have a case of a diseased mind reacting to normal work demands. In such connotation this case is similar to Walck v. Johns-Manville Products Corp., 56 N.J. 533 (1970), where Justice Francis, speaking of a hypochondriac's subjective concern about loss of employment, said:
In other words, if the nature of an employee is such that he is a worrier, the mere fact that he becomes unnecessarily tense and nervous as to whether he is going to keep or lose his job, without more, would not make a heart attack compensable, even if the attack did result from that worry. That kind of anxiety or tension cannot be considered a risk arising out of the employer's work. If worry, about job security alone, which produces a heart seizure would establish compensability, the employer would become an insurer against such attacks. [at 557]
The psychiatric experts here agreed that plaintiff's schizophrenia preexisted the alleged employment exposure and was idiopathic in nature. Plaintiff's expert, Dr. Robert T. Latimer, defined schizophrenia as a mental disorder "which produces pronounced disorganization of the personality with defects in the areas of associated thinking...." Of importance to what we have just said in relation to the Walck case, Dr. Latimer stated that this disease "produces something called autism, which is the tendency to look at the world through one's own pathological conceptualization of it." The doctor suggested that we approach petitioner's reactions to reality with caution: "The man says many things. He is totally unreliable."
Appellant's expert, Dr. David Flicker, presented much the same view.
People irritate him. People on the job, people off the job. Of course, everybody irritated him, he was a schizophrenic. And he was a decompensating schizophrenic. Therefore, he blamed everything on the job and off the job. But particular [sic] on the job. The only thing that any lay mind can do is attribute his difficulties to the situation in which he is in. He therefore attributes it to his family, his friends, his job. Never to other factors such as possibly the use of alcohol, which he was using undoubtedly as a tranquilizer, was aggravating and had produced a vicious cycle in that the more he used alcohol, the less compensation he had. He attributes it to those things around him. Those are not the true etiology, those are the rationalization of a psychotic mind ... The only place a man can be is on his job or off, and he carried his schizophrenia with him on the job and off the job. But it didn't mean that the job contributed in any way to that schizophrenic process.
*577 Compensation awards based upon physical injuries caused by psychic or emotional trauma have been granted in this State. Examples are Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443 (E. & A. 1942), and Hall v. Doremus, 114 N.J.L. 47 (Sup.Ct. 1934). In Geltman the decedent, a salesman, became embroiled with another automobile driver in an abusive and heated argument concerning decedent's operation of his vehicle. The emotional and nervous shock produced what was deemed a compensable heart attack. The Hall case involved a farmhand who witnessed the gory breech delivery of a calf. This produced an emotional reaction which caused him to faint and fall to the floor, suffering injury. Our courts have also awarded compensation for purely psychic injury caused by psychic shock emanating from a single frightening event. Simon v. R.H.H. Steel Laundry Inc., 25 N.J. Super. 50 (Cty.Ct. 1953), aff'd, 26 N.J. Super. 598 (App.Div. 1953), certif. den. 13 N.J. 392 (1953). Simon involved a workman who was in a boiler room when a "violent and terrifying" explosion of a high pressure steam pipe occurred. Simon was rendered unconscious and awoke to a room filled with steam. His terror induced a psychoneurotic disability found to be compensable.
Simon, like Hall and Geltman, are examples of statutory accidents compensable under N.J.S.A. 34:15-17. Heretofore no case has been presented to our courts where mental illness allegedly induced by repetitive work stress was deemed to be an occupational disease as defined in N.J.S.A. 34:15-31. For cases in other jurisdictions treating the issue either as an occupational disease or an accident, see Annotation, "Mental Disorders As Compensable Under Workmen's Compensation Act," 97 A.L.R.3d 161 (1980). See also, the discussion of the subject in 1B Larson, The Law of Workmen's Compensation, § 42.23(b) (1979). The parties in their briefs have exhaustively discussed cases from other jurisdictions, but we see no good purpose served by our undertaking any such venture. The cases range from absolute denial of compensation for apparently strict policy reasons or the absence of an "external event" type of accident, to awards *578 on liberal policy grounds or because of particular statutory language defining injury arising out of and in the course of employment. Whether the cases fall into either camp, they are distinguishable by reason of their facts or the adopted legal approach to those facts.
In our State the principles which in general govern the grant or denial of an award do not differ merely because a case can be labeled as an "accident" or an "occupational disease" matter. Giambattista v. Thomas A. Edison, 32 N.J. Super. 103, 111-112 (App.Div. 1954). In that case this court, in speaking of the occupational diseases sections as they appeared before the 1979 revision, observed:
In view of the definition in our statute, the proof of a causal connection between working conditions and the harm should be the focal point of the inquiry . .. Our current occupational disease sections, by reason of their historical development and the fact they are clearly an integrated part of the system of compensation law, must be interpreted and construed in the light of the same general principles as are applied in cases of injury or death from accident. .. . [at 112]
Under our statute the accident need not be an external, unlooked-for mishap; it is sufficient if there be an accidental injury. Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 135 (1958). In Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13, 21 (App.Div. 1960), we noted:
[T]he question of whether an injury occurred `by accident' is interwoven with the issue of medical causation ... We may better resolve the question `by directly viewing the problem in terms of medical causation within the framework of the requirement that the injury or death "arise out of" the employment.'
There is, thus, an analogy in principle between occupational disease cases generally and the heart and cerebral accident matters in that they all necessarily focus upon the requirement that the claimed condition (or aggravation thereof) arise out of the employment. Equally applicable to occupational disease cases occurring, as does this case, prior to January 10, 1980, is the principle of the standard of proof required in heart and cerebral accident cases by Dwyer v. Ford Motor Co., 36 N.J. 487, 493 (1962), and Walck, supra; Giambattista, supra 32 N.J. Super. at 112. Dwyer, decided after the Ciuba case had obviated the *579 need for a showing of unusual strain or exertion, iterated the principles that injury at work, without more, is noncompensable; the burden of establishing connection between the heart injury and the work effect as an aggravating factor is the burden of the compensation petitioner; repetitive, usual strain, whether great or small, may cause compensable injury, but in addition, that a petitioner's proofs must establish that the work effort "in reasonable probability contributed in some material degree" to the heart injury or death. Material degree was therein defined as "an appreciable degree ... greater than de minimis."[3] 36 N.J. at 493.
*580 Walck v. Johns-Manville Products Corp., supra, further illuminates the standard of proof required by Dwyer. The case also has factual similarity to this case. In Walck the decedent "was subjected to various stresses and strains and conditions which caused and aggravated a cardiovascular condition which culminated in a fatal heart attack...." The theory of petitioner's case at trial was that after his supervisor of many years retired, decedent became nervous, tense and insecure about his own work performance and ability to hold his job working under his new superior. The Division of Workers' Compensation, the County Court and the Appellate Division found for petitioner. The Supreme Court reversed. Justice Francis, speaking for an unanimous court, stated the applicable principle as follows (56 N.J. 533, 556):
Put in conventional terms, the heart attack, to be compensable, must arise out of the employment. That is, it must be due in some realistic sense and material degree to a risk reasonably incidental to the employment; the attack must issue from or be contributed to be conditions which bear some essential relation to the work or its nature.
In this case, recovery is sought on the theory that decedent was tense and nervous for a long period of time  the last year of his life  because of a feeling of insecurity about his job; he worried that he might lose it. But such worry, which came into being because of the inherent nature of the employee and which is not shown by the greater weight of the evidence to have had a reasonable basis in fact, cannot be said to give compensability to a heart attack which is attributed to emotional strain resulting from such unfounded or imaginary worry. In other words, if the nature of an employee is such that he is a worrier, the mere fact that he becomes unnecessarily tense and nervous as to whether he is going to keep or lose his job, without more, would not make a heart attack compensable, even if the attack did result from that worry. That kind of anxiety or tension cannot be considered a risk arising out of the employer's work. If worry, about job security alone, which produces a heart seizure would establish compensability, the employer would become an insurer against such attacks. [56 N.J. at 556; emphasis supplied]
Walck clearly indicates that the purely subjective anxiety and tenseness occasioned because the worker is a worrier and frets *581 about his job give rise to no right to compensation because "such anxiety or tension cannot be considered a risk arising out of the employer's work." It seems equally clear that a mental illness where (as petitioner's expert, Dr. Latimer, put it) the underlying disease produces "autism, which is the tendency to look at the world through one's own pathological conceptualization of it," demonstrates as well as subjective reaction of petitioner's mind to conditions of work. Even if such schizophrenic view of the work adds to the disease and makes it more acute, such result cannot "be due in some realistic sense and material degree to a risk reasonably incidental to the employment," nor can it be realistically viewed as bearing "some essential relation to the work or its nature." Id. at 556. The stress of the job exists for an incipient schizophrenic as does the stress of life itself, whether at work or in social context. As Dr. Flicker remarked, "[t]he only place a man can be is on the job or off, and he carried his schizophrenia with him on the job and off the job. But it didn't mean that the job contributed in any way to that schizophrenic process."
Of the many cases from other jurisdictions cited by both parties, two merit discussion. Petitioner's main thrust to the case here presented relies on a Michigan case similar in factual content to this matter, Carter v. General Motors Corp., 361 Mich. 577, 106 N.W.2d 105 (Sup.Ct. 1960). Appellant takes the view that as a matter of law mental illness induced by gradual mental stimuli is never compensable (a view we find lacking in merit), and failing that approach, falls back upon the position that the applicable rule is that of Swiss Colony, Inc. v. Dept. of Ind., L. & H. Rel., 72 Wis.2d 46, 240 N.W.2d 128 (Sup.Ct. 1976). These two cases are illustrative of what may be termed the subjective view (Michigan) and the objective approach (Wisconsin) to the question of mental conditions caused by gradual mental stimuli.
Carter involved an assembly line employee who worked on the line in a "hub job" for only 12 days before suffering emotional collapse diagnosed as schizophrenia. The job required him to *582 take a hub assembly (case and cover) from a nearby fellow worker's table to his own workbench, remove burrs with a file, grind out holes in the assembly using a drill, and put the assembly on a conveyor belt. Carter could not keep up with the pace of the job unless he took two assemblies at a time to his workbench. His foreman prohibited this practice because the parts became mixed up on the conveyor when he did so. "Thus, when he took only 1 hub assembly at a time, he fell behind; when he fell behind, he took 2 assemblies; but when he took 2 assemblies, he got the assemblies mixed up and was berated by the foreman." He started this job on October 8, 1956 and sustained an emotional collapse on October 24. A divided compensation board awarded compensation and the Supreme Court of Michigan in a 5-3 decision affirmed. The case was decided under medical evidence, undisputed by the employer, which demonstrated:
[T]he Mr. Carter should not be employed in production work, not because of his paranoid schizophrenia, but for the same reason he should not have been employed in such work in the first place: Mr. Carter has a personality configuration that makes him more susceptible than others to psychotic breakdowns when subjected to pressures such as are encountered in production line employment.... [Id. 106 N.W.2d at 113]
Were we to follow the reasoning of this case and give a compensation award for such individual and purely subjective reaction to the work itself, we would change our workers' compensation statute into a program of general health insurance  clearly not the intent of our Legislature. Walck, supra, 56 N.J. at 557. That such is the nature of Michigan's approach to the problem is apparent from a later decision of that court. MacKenzie v. General Motors Corp., 394 Mich. 466, 232 N.W.2d 146, 152 (Sup.Ct. 1975). In that case the worker suffered from a long-standing personality defect of compulsive perfectionism. His perception of the work demands by reason of this defect eventually caused a neurotic collapse. The Michigan court held:
Such an objective standard (i.e., the effect of the actual work environment on the average worker) is not the standard to be employed. In workmen's compensation psychiatric disability cases a subjective standard (i.e., the effect of the perceived work environment on the claimant) is used when determining whether the injury arose out of the employment.

*583 In Carter v. General Motors, 361 Mich. 577, 106 N.W.2d 105 (1960), this Court affirmed an award of compensation to an employee whose disability resulted from his pre-existing mental disturbance and ordinary assembly line pressures.
The Court in Carter applied a subjective test, saying at 585, 106 N.W.2d at 109: `... his disability was caused by emotional pressures produced by production line employment not shown by him to be unusual in any respect,  that is, not shown by him to be any different from the emotional pressures encountered by his fellow workers in similar employment.'
The instant case is on all fours with Carter. The fact that MacKenzie's mental condition became acute because of the abnormal perception of his employment does not make the connection with that employment any less real for MacKenzie.
The subjective approach manifested in the foregoing quotation runs counter to the principle of Walck that the risk arise out of the employer's work (id., 56 N.J. at 557) and fails to meet the pre-1980 statutory requirement that the occupational disease be one "arising out of and in the course of employment" and "due to causes and conditions which are ... characteristic ... of or peculiar to a particular ... employment," or be a disease "due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." (Emphasis supplied). The employment here is but another fact of life which petitioner perceives in schizophrenic manner as he reacts to any other aspect of life. The employment is a static fact; it is his schizophrenic perception which is the moving and causative factor.
The Swiss Colony case, supra, relied on by appellant, adopts an objective test as to mental illness brought on by gradual mental stimuli. The case involved Etha Schillinger, a purchasing agent for a mail-order cheese company. In the period from 1961 to 1971 the business increased gross sales from 2 million to 13 million. Schillinger's duties increased greatly during this time. Her work went on at a heavy pace throughout the year but became concentrated at Christmas. Deadlines arose constantly and machine breakdowns and merchandise lost or strayed caused stress. Testimony indicated that Schillinger's job "was unusually nerve-racking and subjected her to greater pressures and tensions than those experienced by the average *584 employee" (id. 240 N.W.2d at 131). Her immediate superior with whom she had close contact was hired in July 1970. He was "negative, brusque ... and challenged and belittled any decision Schillinger would make. He was a very aggressive man, somewhat cold in his dealings with other people." As a result of the pressures attendant to her work and her new supervisor's burdensome and belittling behavior, Schillinger, in the spring of 1971, became disorganized and rattled and suffered weight loss, insomnia, exhaustion and depression. She testified that in 1971 she worked more hours that she had in any previous period. She worked more than 50 hours a week and took work home regularly. Because of the press of work she took no vacation that year. Eventually she was diagnosed as a schizophrenic. Upon this record of stress truly arising out of the employment, the Wisconsin court affirmed an award of compensation. Professor Larson, in the section referred to supra, has this to say of the Swiss Colony case:
The real distinction here should be, not between sudden and gradual stimuli, but between gradual stimuli that are sufficiently more damaging than those of everyday employment life to satisfy the normal `arising-out-of' test, and those that are not....
Wisconsin has produced the most straightforward example of this correct way of drawing the line, in Swiss Colony v. Dept. of ILHR. The claimant was a purchasing agent for a mail-order cheese business. She suffered a schizophrenic mental breakdown, which she attributed to nerve-wracking seasonal business and harassment by her supervisor. After the hearing examiners had entered an award, the Supreme Court announced the rule in School District v. ILHR Dept. that `in order for nontraumatically caused mental injury to be compensable in a workmen's compensation case, the injury must have resulted from a situation of greater dimensions than the day-to-day mental stress and tensions which all employees must experience.' The facts here were found to meet this standard. [§ 42.23(b), 7-639]
We have rejected the Michigan rule as inconsistent with New Jersey precedent and this result obtains whether the case be one of accidental injury or occupational disease. For the same reasons we must reject the premise for the Wisconsin standard. Wisconsin requires that the emotional stress be "out-of-the ordinary work stresses" (240 N.W.2d at 132). The requirement of unusual strain or stress as a causative factor was *585 rejected in Ciuba and Dwyer and we, as an intermediate court, cannot revive that approach. The guidelines of Walck are for present purposes sufficient. We hold, thus, that in cases of mental illness alleged to have been produced by gradual mental stimuli the "arising out of" provisions of our integrated statute and the case law interpretative thereof as they existed in the time frame of this case require more than proof of subjective reaction of the employee. "Put in conventional terms, the [mental illness] to be compensable, must arise out of the employment. That is, it must be due in some realistic sense and material degree to a risk reasonably incidental to the employment; the [onset] must issue from or be contributed to by conditions which bear some essential relation to the work or its nature." Id. 56 N.J. at 556.
The employee's subjective reaction is not to be disregarded but it cannot be the sole ingredient of the formula for compensability. There must be objective evidence which, when viewed realistically, carries petitioner's burden of proof to demonstrate that the alleged work exposure was to a material degree a contributing factor. Cases such as this one must be approached with caution so that in the end result natural sympathy and the concomitant desire to aid the plight of a mentally ill individual is not substituted for the statutory requirement that the mental condition arise out of the employment. This is especially so where, as here, Dr. Latimer stated that petitioner was "totally unreliable." Where, by reason of a diseased mind, a worker's perception of his employment makes his condition more acute, we cannot grant what amounts to a lifetime pension at the expense of industry or the ultimate consumer. In such case the societal duty to aid must, because the mental illness did not arise out of employment, be met by some other quarter of society. Here that need is met. Petitioner is presently on total disability, Social Security benefits.
The evidence presented below primarily consisted of petitioner's subjective neurotic reaction to the demands of his job, *586 particularly the requirements of the assembly line. Other evidence, however, indicates that the assembly line here did not always stay at the same speed and had its continuity interrupted daily for normal 15-minute morning and afternoon breaks, lunch break and substitution of the standby relief man when a call of nature had to be answered. The evidence also shows that the conveyor was adjusted to the work speed of the average worker and that, in addition to the normal 15-minute morning and afternoon breaks the conveyor workers received a ten-minute break in the morning and a similar break in the afternoon. The evidence given by petitioner's co-employees as to the conveyor line, when viewed realistically, does not give objective support to the picture petitioner subjectively paints of his feeling of constantly having telephones coming at him and eventually as though thousands of telephones were coming at him. Only one worker testified that one had to "race" to keep up, and it appears that this employee was terminated for sleeping on the job. The other witnesses on this issue more realistically stated that workers were kept "pretty busy," or that there was no time "to half step." This latter phrase was explained to mean he couldn't "lay back, you know relax." Although the evidence given by coworkers was viewed by the trial below as corroborative of petitioner's testimony it at best demonstrates the necessary everyday requirements of an assembly line type of operation. It was petitioner's unfortunately diseased mind which turned this environment into an abnormal situation.
The opinion below, like the opinion of petitioner's experts, (save only Dr. Pollock who, although petitioner's expert, found the schizophrenia unrelated to petitioner's employment), all suffer the same flaw. They all proceed on the premise that petitioner's subjective reaction to his employment is ground for legally sufficient causal relationship. The doctors' errors in this regard are understandable since both Dr. Kuvin and Dr. Latimer, as examining physicians, were wholly dependent upon the hypothetical question which relied entirely upon petitioner's subjective view of his work demands. The substance of Dr. *587 Kuvin's opinion is that given petitioner's subjective view that his work created stress "of inordinate degree," it was then something he, as a schizophrenic, "was not able to handle," ergo, the work aggravated the underlying schizophrenia. Dr. Latimer held the same view and his testimony demonstrates his opinion is totally dependent on the hypothetical recitation of petitioner's subjective perception of inordinate stress. He testified:
Q. Well, let's assume, Doctor, that he only packed three hundred fifty, three hundred seventy-five. Would your opinion be the same?
A. Again I would have to go into the plant and see what it's like.
Q. I see. In other words, you're not certain.
A. I am not certain.
Q. All right. Now, Doctor 
A. I'm not certain about the objectivity. I'm certain about the person's impression. I mean, his reality. I'm sure that everybody who is working in that plant doesn't have a schizophrenic episode. [Emphasis supplied]
The opinion below, despite the novelty of the case presented, cites no case or statute law, nor does it set forth any legal standard upon which the judge relied in reaching his conclusion. Absent from the opinion below is the necessary conclusion that this "occupational disease" realistically and in material degree was due to petitioner's employment. The judge found petitioner was under stress to produce quotas, particularly as to the packing job. This conclusion, under the evidence presented, we view as legally erroneous because it is clearly founded upon petitioner's subjective reactions. We note also that the compensation judge rejected the testimony of appellant's witness, Dr. Flicker, because "much of Dr. Flicker's testimony with regard to causal relationship dealt with the `production' of schizophrenia rather than the triggering of schizophrenia." Obviously, the judge felt that Dr. Flicker required the work to be a direct cause of schizophrenia rather than an aggravation of the disease. A reading of Dr. Flicker's testimony demonstrates that the judge was mistaken. Dr. Flicker stated:
[S]chizophrenia is a disease without known etiology, but enough of it is known to know that these factors do not enter into its etiology. I feel the patient has a schizophrenia.... I do not believe it's related to his industrial activity, nor that his industrial activity in any way entered into it, in the usual phraseology of etiology; aggravation, exacerbation, etc., etc.... . [Emphasis supplied]
*588 In footnote 1, ante, we made reference to the "credibility of the entire case" in pointing out that the petitions filed by plaintiff made no reference to work stress or quota stress as a causative factor. The petitions reflect, at worse, exposure to chemicals and fumes. This would seem to indicate that no assembly line stress or quota stress concerned plaintiff when he, almost one year after his first onset, filed his petitions. Likewise, it must be noted that when, on November 27, 1972, petitioner went to Dr. Pollock, a psychiatrist, he revealed no complaints such as he advanced at trial relative to the assembly line stress which Dr. Kuvin, years later, found to be "inordinate stress." Dr. Pollock candidly admitted that in 1972 "I didn't know about this exposure to these machines and its effect on him." Dr. Pollock reexamined petitioner in 1973, and again petitioner made no mention of anything other than exposure to dust and noxious fumes. Dr. Pollock again candidly stated, "I had very little knowledge of the assembly line thing. I really did not know it until I read this hypothesis in 1975." One suspects that the issue of assembly line stress loomed large in petitioner's mind only as the case progressed. This might explain the fact that the history given at petitioner's initial hospitalization did not mention thousands of telephones coming at him but was to the effect that:
This is the first EOVAH admission for this 24 year old single male, living by himself, admitted on 12/29/71. Patient gave no history of previous psychiatric treatment. He came here for being nervous and because sometimes in my mind I am sleeping. During Christmas time I was drinking and thinking that I was God. He expressed no suicidal or homicidal ideations. He admits having lots of pressure, at times he feels depressed, feels alone and he starts drinking. This time he met a girl and they started to drink and drink and drink. I got high and I was crazy thinking I was God. Patient admitted no delusions or hallucinatory ideas when sober.
As indicated earlier, we are conscious of the limitations placed upon our review by Close v. Kordulak Bros., supra. That rule was never intended, however, to foreclose reversal when the compensation judge's approach to the case runs contrary to settled law and statutory intent. We find that the compensation judge permitted recovery without proof that the employment *589 realistically and in material degree contributed to petitioner's ills and present disability. We therefore reverse the judgment entered below and remand the matter to the compensation court for a determination of the disability properly awardable to petitioner for his pulmonary disfunction and hearing loss.
NOTES
[1] We do not point to these pleadings because we hold the view that ancient rules of niceties of pleading govern these matters. The allusion is directed to the credibility of the entire case, a point we feel the judge of compensation overlooked and a subject to which we will address our attention later in this opinion.
[2] In 1979 this section was amended and presently reads:

34:15-31. `Compensable occupational disease' defined
a. For the purpose of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment.
b. Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.
[Amended by L. 1979, c. 283, § 10, eff. Jan. 10, 1980]
(The italicized portions represent the amendments. The crossed-out portions are omitted from this enactment.) The Joint Statement of the Senate Labor, Industry and Professions Committee which accompanied the Senate and Assembly bills states (at page 2) that this amendment "would benefit employers by: ... limiting compensation for occupational disease to those which are characteristic of and peculiar to a particular employment...."
[3] After 17 years of experience with the Dwyer rule in the heart and cerebral accident cases, the Legislature, in the revision of 1979 (L. 1979, c. 282, § 3, eff. Jan. 10, 1980), swung the pendulum in the opposite direction. N.J.S.A. 34:15-7.2 reads:

34:15-7.2 Claim based on cardiovascular or cerebral vascular causes; preponderance of credible evidence of proof of cause by work effort
In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
Material degree means an appreciable degree or a degree substantially greater than de minimis. [Emphasis supplied]
The Joint Statement referred to in footnote 2, supra, indicates, at page 2, that the above section "would benefit employers by: ... (2) countering the far-reaching effects of Dwyer v. Ford in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of injury or death was job-related in a material degree...." One commentator characterized this amendment as reversing Dwyer "and much of our liberal heart law in broad sweep." Lefelt, "Workers' Compensation in New Jersey: A critique of S-802," 104 N.J.L.J. 425, 438 (Nov. 15, 1979). N.J.S.A. 34:15-7.2 and the occupational disease amendment, N.J.S.A. 34:15-31, were not in effect at the time the cause of action of petitioner herein accrued. Certainly the effect of N.J.S.A. 34:15-7.2 upon Dwyer has no bearing upon this case. Nor, for that matter, can N.J.S.A. 34:15-31, as amended have any effect on the present matter. Both enactments are, however, illustrative of a present pragmatic legislative intent to "put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from unjustified worker's compensation costs that are presently among the highest in the nation." Joint Statement, supra at 1.