BUETTNER, Appellant, vs. INDUSTRIAL COMMISSION and others, Respondents.

*June 5—July 3, 1953.*

For the appellant there were briefs and oral argument by *Ken Traeger* of Gresham.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

MARTIN, J.   Appellant concedes that if there is any credible evidence to support the findings of the commission, its order must be affirmed, *Milwaukee E. R. & L. Co. v. Industrial Comm.* (1936), 222 Wis. 111, 267 N. W. 62; and that unless the disability be shown to have resulted from an occupational disease, its cause must be found in an accident in order to warrant the award of compensation, even if the physical effort involved in the work made some contribution to the final disability, *Schmitt v. Industrial Comm.* (1937), 224 Wis. 531, 272 N. W. 486.

Here the only evidence before the commission in determining whether the appellant's disability arose out of his employment is the testimony of Dr. R. H. Quade.

Appellant began his employment at a sawmill operated by the Keslers on December 8 or 9, 1950; and on December 16, 1950, while bending over to examine a motor, he experienced a severe pain in his back. A diagnosis of protruded intervertebral disc was made and in April, 1951, Dr. Quade performed an operation for the removal of said disc. The

contention upon which appellant bases his claim for compensation is that the cranking of a heavy motor at the sawmill brought about the injury which caused the protrusion of the disc, although the disability did not occur until some time later when he stooped over.

According to Dr. Quade's testimony, some degree of degenerative process is usually necessary to produce a herniated disc. On this point, the doctor testified:

"I was satisfied at surgery that this patient had arthritis with spurring and lipping, both by X ray and that surgery. He had thickening of ligaments. He had the general picture of arthritis along with some evidence of degeneration, and as far as the disc itself was concerned on removal, that disc had been present definitely for some period of time and there was—it would fit in my classification of having a degenerative background."

In his opinion, such degenerative process was of "undoubtedly months' duration, that is five months or more, four months, a year, two years," and that—

"I would not consider that a disc, when we speak of degeneration, could degenerate in ten days in the way that we are speaking. In other words, I don't consider acute degeneration to be a question of—that is, these discs are chronically degenerated, that is over long periods of time. Acute degeneration would only occur if a relatively normal disc were forcibly disrupted."

The second situation mentioned by Dr. Quade as being usually present in a case such as this is stress-and-strain injuries which put pressure on the degenerated disc. On this point, the doctor was asked:

"*Q.* According to his testimony, he was working in a sawmill. It doesn't appear from the testimony that his work involved any unusual stresses or strains except on occasion he would crank these motors in the morning. Now assuming that he had worked with the Keslers for only a period of ten days, do you have an opinion as to whether or not any stress

or strain that you know of that he might have undergone in that employment was very much a factor, or was a factor at all in the disc protrusion?

"*A.* Again I would say that stresses and strains before that ten days, during that ten days, all may have their positive relationships. If a stress during that ten days may have produced the picture, you would have to say that was the final incident, that it produced this patient's disc. On the face of it, in answer to your question, one could only say that what did happen during those ten days *and what happened for months previous* are all factors. . . . it seems to me that there is reasonable medical probability that all this effort previous to the stooping and bending could very well be an important factor in bringing on the final result."

Dr. Quade further stated that the appellant's prior employment could very definitely have had a bearing on the disability: "That is why I think the background of this thing goes back over months. I don't think there is any one single incident that will cause a disc." He said that the appellant's previous work as a truck driver could be a factor in the stress and strain to which the disc was subjected. He went on to explain that sneezing and coughing also produce such stress and strain; that he had one case where the protrusion of a man's disc was caused by bending over to tie his shoelace. In summing up the substance of his testimony, the following is significant:

"In this particular case, I feel that we had a pre-existing arthritic degenerative state involving a protruded intervertebral disc, but I feel that in this particular case that effort, stress and strain, heavy lifting, as testified to, are all very definitely factors in the final picture, and are causative in that respect as to the final protrusion of the disc. Unusual stress and strain and effort often will pre-exist the protrusion of a disc. . . . actually a disc syndrome is not just what happens at one instance. It is a progressive thing. It is always progressive. It has progressive characteristics over a period of time, and that is why I say you can't pin it down

to one single thing. In this particular instance, you have the effect of both the pre-existing state and stresses and strains to which this disc was subjected including the final story which was simply one of bending.

"I can only surmise that this patient had a setup—I mean *the stage was set for a protrusion,* and beyond that, with reasonable medical probability on the basis of findings here, I cannot make a further statement."

Dr. Quade emphasized, in explaining that no single isolated cause exists for a herniated disc, that there are a multiplicity of causes involving both degenerative features and repeated traumatic features (stresses and strains) which result over the course of time in a complete protrusion of a disc, producing disability.

We have read the doctor's testimony in its entirety and are of the opinion that the commission's finding—that the incident upon which appellant predicated his injury did not constitute an accident arising out of the employment—is supported by the evidence. It is clear from the doctor's testimony that no one could evaluate the effect of the stress and strain involved in appellant's work with respect to his disability. Dr. Quade himself could make no such evaluation, and while it was obvious that the cranking of the motor *could* cause a disc protrusion, there was no evidence that it actually did. The degenerative condition had existed for months before; appellant had engaged in previous employment which had subjected his back to stresses and strains; he had been employed at the sawmill for less than ten days when the disability occurred. It is clear that, with the condition that appellant's back was in for months prior to the disability, almost any exertion could have caused the disc to protrude. The incident which appellant contends produced the disability cannot be termed "accidental," and we find nothing in the record to compel a finding that the disability arose out of appellant's employment.

In *Skelly v. Industrial Comm.* (1949), 254 Wis. 315, **318**, 36 N. W. (2d) 58, this court said:

". . . it must be noted that by the definition **in sec.** 102.01 (2), Stats., ' "injury" is mental or physical **harm to** an employee caused by accident or disease. . . .'

"As stated in *Schmitt v. Industrial Comm.* 224 Wis. 531, 535, 272 N. W. 486,—

" 'Unless, however, the disability be shown to have resulted from an occupational disease, its cause must be found in an accident in order to warrant the award of compensation, and *a mere breakdown due to disease is not compensable,* even if the physical effort involved in the work made some contribution to the final disability.'

"Thus, as was stated in *Employers Mut. L. Ins. Co. v. Industrial Comm.* 212 Wis. 669, 671, 250 N. W. 758,—

" 'One may be so afflicted with heart disease that anything which amounts to exercise in the usual procedure of his work may destroy his life. It would seem fair to say in such an instance that no industrial accident was responsible for the injury or the death.' "

Since we are of the opinion that the judgment confirming the commission's order must be affirmed, it is unnecessary to consider the question whether E. A. Kesler or Willard Kesler was the employer.

*By the Court.*—Judgment affirmed.