Mrs. Drenk's Foods, Inc., and another, Respondents, v. Industrial Commission and another, Appellants.*

*October 5—November 3, 1959.*

* Motion for rehearing denied, without costs, on January 5, 1960.

194

For the appellant Industrial Commission the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the brief were *John W. Reynolds,* attorney general, and *Mortimer Levitan,* assistant attorney general.

For the appellant Jenny Machava there was a brief by *Jack D. Moertl* of Milwaukee.

For the respondents there was a brief by *Kivett & Kasdorf,* attorneys, and *Clifford C. Kasdorf* and *Nonald J. Lewis* of counsel, all of Milwaukee, and oral argument by *Mr. Lewis* and *Mr. Clifford C. Kasdorf.*

CURRIE, J.   The issues on this appeal are as follows:

(1) Are the findings, that the employee sustained an accidental injury and that such accident arose out of her employment, true findings of fact or are they conclusions of law?

(2) If they are findings of fact, is there credible evidence to sustain such findings?

(3) Should the commission have reserved jurisdiction to determine permanent disability?

(4) Did the evidence require that the commission award more benefits than it did for temporary total disability and that it reserve jurisdiction over such issue?

*Proper Findings of Fact.*

The findings of fact of the examiners found that the employee sustained an accidental injury and that such accident arose out of her employment. These findings were affirmed by the commission. The plaintiffs contend that these are mere conclusions of law and not binding upon a reviewing court.

The controlling statute is sec. 102.18 (1), Stats., which provides, "After final hearing the commission shall make and file its findings upon all the facts involved in the controversy, . . ." This statute has been construed as not requiring that such findings by the commission take the form of stating evidentiary facts, but only ultimate facts. *Wisconsin Appleton Co. v. Industrial Comm.* (1955), 269 Wis. 312, 320, 69 N. W. (2d) 433, and *Van Pool v. Industrial Comm.* (1954), 267 Wis. 292, 294, 64 N. W. (2d) 813.

The case of *Schuh v. Industrial Comm.* (1958), 2 Wis. (2d) 611, 612, 87 N. W. (2d) 256, provides a good illustration of what is meant by an ultimate fact. There the finding attacked was "that applicant did not sustain injury arising out of his employment with the respondent." This court held the same to constitute a true finding of fact and not a conclusion of law.

In the instant case we are satisfied that the questions, whether the employee sustained an accidental injury and whether such accident arose out of the employment, presented ultimate questions of fact. Therefore, the attacked findings are true findings of fact which meet the requirements of sec. 102.18 (1), Stats.

However, even if the commission had made inadequate or defective findings of fact, the reviewing court would have no power to decide for itself any issues of fact. The court would be limited to remanding the proceedings to the commission to make the required findings, as was recently done in *Johnson v. Industrial Comm.* (1958), 5 Wis. (2d) 584, 93 N. W. (2d) 439.

### Evidence in Support of Findings.

We will now review the evidence to ascertain whether there is any credible evidence in view of the entire record which will support the findings. If there is, then such findings are conclusive upon the reviewing court. Sec. 102.23 (1), Stats. In so reviewing the evidence we shall keep in mind the rule that, if conflicting reasonable inferences can be drawn from undisputed evidence, a finding of the commission based on one of such inferences is conclusive upon the court, *Gant v. Industrial Comm.* (1953), 263 Wis. 64, 69, 56 N. W. (2d) 525; but, if only one reasonable inference can be drawn therefrom, then a finding contrary to such inference is not binding upon the court and may be disregarded. *Van Roy v. Industrial Comm.* (1958), 5 Wis. (2d) 416, 425, 92 N. W. (2d) 818, and *Lewis v. Industrial Comm.* (1922), 178 Wis. 449, 453, 190 N. W. 101.

At the time of the alleged accident the employee was a young married woman thirty-four years of age and worked in the employer's factory in Milwaukee. She was engaged in filling cellophane bags with potato chips and stapling them shut. This was a machine operation. The potato chips reached the machine operated by the employee by means of an overhead conveyor and were fed into the machine through a metal chute that was vibrated by an electrical device on the top of the machine called a "vibrator." The machine was mounted on a wooden platform and the oper-

ator stood on a separate, smaller wooden platform. The bottom of the metal chute out of which the potato chips came was slightly higher than the waist level of the operator. A photograph received into evidence shows a female operator standing on the little platform in the act of filling one of the cellophane bags. The top of the bag is drawn over the bottom of the metal chute and the operator is holding it in place with one hand touching the metal chute, with the other hand holding the bottom of the bag.

The alleged accident occurred at about 7:45 in the morning of August 29, 1956. Mrs. Machava, the injured employee, testified that at the time she had her left hand on the machine holding the bag to be filled in place. In her own words, "All of a sudden I felt like somebody was shaking me and everything flashed up so I felt kind of dizzy, like from something wrong, so I hollered for Mrs. Johnson, I hollered, 'Rose,' and that was all I could say and then I faints and she holds me up." It had been raining that morning before the alleged accident and about fifteen minutes prior thereto, Mrs. Machava had observed a flash of lightning that had lit up the entire portion of the factory in which she was working. Mrs. Johnson, a fellow employee, caught Mrs. Machava as she was beginning to faint and prevented her from falling. Mrs. Johnson testified that there was a big flash of lightning and then Mrs. Machava started to fall, and she ran and caught her. It was Mrs. Johnson's further testimony that, "When I caught hold of her I got hold [of] each of her hands. When I caught her with my hands, it stung just as I had a stinging in my hands . . . I wouldn't say it is a shock, but like pins were sticking me." Mrs. Klein, another fellow employee, testified to having seen the big flash of lightning described by Mrs. Johnson which occurred at the time Mrs. Johnson grabbed Mrs. Machava. Mrs. Klein stated that such lightning scared her.

Mrs. Johnson thereafter operated Mrs. Machava's machine for about fifteen or twenty minutes when it stopped working. The record is silent as to what caused it to stop. A factory maintenance man was summoned and he discovered that the wires leading into the electric coil of the vibrator had burned out and he replaced the coil. The machine works independently of such vibrator so the burning of such wires would not in itself have caused the machine to stop. There were no marks or burns on the platform on which Mrs. Machava had been standing.

While unconscious, Mrs. Machava was transported on a hand truck to the ladies' rest room. When she came to, her breathing was short, her hands were numb, and she was shaking. After a little while, because her own machine was not operating, she attempted to fold bags on another job but after a short time had to desist because she was unable to work. The forelady then sent her to the office of a Dr. Hanson. When she arrived there she had severe pain in her left shoulder. Dr. Hanson apparently was then away from his office but his nurse applied heat to the region where the pain was. Mrs. Machava fainted and had to be taken home in a taxicab.

That same day Mrs. Machava's husband called the employer and informed it of what had occurred. The employer then sent Dr. Flood, a general medical practitioner, to the Machava home to treat her. He found her in bed and in pain. Dr. Flood at once had her taken to St. Mary's Hospital where she was confined until September 28, 1956, under the treatment of Dr. Flood. The history given by her to the doctor was that she had received an electric shock from a machine. There were no burns on her skin. After leaving the hospital she still continued to have severe pain in the shoulder region and was disabled from working. Such condition still continued until Dr. Flood referred her to Dr. Welsh for treatment on June 29, 1957.

Dr. Welsh is director of physical medicine at Columbia Hospital and has a staff of 10 trained therapists under his supervision. Mrs. Machava gave Dr. Welsh a history of having sustained a severe electric shock to her left arm and shoulder on August 29, 1956. Dr. Welsh prescribed a course of diathermy treatment initially. After the third treatment it was obvious to him that she was not gaining relief fast enough. He then switched over to a therapy described as "ultrasound" and this was continued until she was discharged on November 6, 1957.

Dr. Flood testified at both the original and adjourned hearings and Drs. Welsh and Evans testified at the latter hearing. Dr. Evans is a specialist in internal medicine and he had examined Mrs. Machava at the request of the plaintiff Employers Mutual Casualty Company, on September 19, 1956. He inspected various electrocardiograms taken of Mrs. Machava after the alleged accident and also some taken in 1954 when she had undergone a sinus operation.

Dr. Flood diagnosed Mrs. Machava's condition which caused the pain as a myofascial syndrome which he described as a pattern of pain around the shoulder girdle which has its etiology in the connective tissue and muscular elements of the area. He expressed the definite opinion that an electric shock had caused such myofascial syndrome. It was his belief that the shock had caused such a contraction of muscle in the shoulder area as to tear the connective tissues and muscle fibrils. While he did not himself read the electrocardiograms, but had reports of such readings from a consultant physician, it was also Dr. Flood's opinion that the shock had aggravated a pre-existing heart disease. The 1954 electrocardiograms disclosed a heart defect which was thought to be due to an attack of diphtheria Mrs. Machava had sustained many years before. It was Dr. Flood's opinion that, although Mrs. Machava had made marked improvement under Dr. Welsh's treatment, she

was still disabled from working as of December 9, 1957, the date of the adjourned hearing.

Dr. Welsh gave it as his opinion that Mrs. Machava had suffered from an acute myofascial syndrome. He first testified that this could have been caused by electric shock, and later stated that he believed this to be the case. Dr. Welsh's opinion was that she was able to resume work as of November 6, 1957, in so far as her left shoulder ailment was concerned, and that there were no residuals therefrom. He expressed no opinion with respect to the heart condition.

Dr. Evans diagnosed Mrs. Machava's shoulder condition as traumatic myositis. In layman's language this is a muscle inflammation caused by injury. He was strongly of the opinion that such condition had not been caused by electric shock. He based this conclusion upon the facts that there had been no burns on the wooden platform on which Mrs. Machava had been standing, or to her skin, and no neurological changes had occurred suggestive of damage to the highly conductive nervous-system elements. In his testimony he made the highly significant statements: "I felt that, in all probability, although not with reasonable certainty, that the myositis was due to either the violent muscular contraction or the fall, or some wrenching unusual position. . . . It was my opinion, at the time I examined her, that some violent exertional effort to recover her balance or in a momentary alarm or perhaps a fall was to me a more acceptable explanation than current flow."

Based upon his own reading of the 1954 and 1956 electrocardiograms, Dr. Evans testified that it was his opinion that the alleged accident had not aggravated the pre-existing heart ailment.

An assistant professor of electrical engineering at Marquette University also was called as an expert witness by the applicant. It was his opinion that if lightning had caused the injury it would have left visible burns or spots in the

path of its travel. He also testified that when lightning strikes a person such individual never sees the bolt that struck him or her.

The foregoing review of the evidence leaves no doubt but that Mrs. Machava did sustain a severe muscle contraction in the left shoulder area on August 29, 1956, while at work for the employer, and that such contraction produced the myofascial syndrome or traumatic myositis found by all three physicians who testified. The very appellation "traumatic," which was applied to the myositis by Dr. Evans, demonstrates that such condition was due to accident. It therefore follows that the finding of fact, that Mrs. Machava, "while performing service growing out of and incidental to her employment with the respondent [employer] sustained accidental injury," is amply supported by credible evidence.

The slightly closer question is that of whether there is *credible* evidence to sustain the further finding, that such found accident causing the injury arose out of such employment.

This court will take judicial notice of the fact that it is possible to sustain an electric shock to the person without burning the skin. Drs. Flood and Evans disagreed in their opinions as to whether a shock severe enough to directly cause the muscular contraction which resulted here could occur without such skin burning. Dr. Evans' theory was that the muscle injury was due to a sudden wrenching due to a fall or fright. There is ample evidence from which the commission could reasonably infer that Mrs. Machava did sustain some kind of electric shock, even though a direct striking by bolt of lightning be ruled out. It then becomes immaterial whether such shock directly produced the muscle contraction, or whether the latter was due to a wrenching caused by such shock. In either case the accident was incidental to the employment. Even a wrenching

due to Mrs. Machava's partly falling from the elevated plat-
form on which she was standing would make the accidental
injury resulting therefrom one incidental to the employment.
*Cutler-Hammer, Inc., v. Industrial Comm.* (1958), 5 Wis.
(2d) 247, 92 N. W. (2d) 824.

### Reservation of Jurisdiction to Determine Permanent Disability.

This and the ensuing division of the opinion deal with
issues raised by Mrs. Machava in her counterclaim in the
circuit court action.

Sec. 102.18 (1), Stats., grants to the commission the
power to issue interlocutory findings and orders. The com-
mission exercised such power in the instant case to the
extent of making its order interlocutory with respect to
determining the amount of the medical and hospital dis-
bursements by the employee as to which reimbursement
would be ordered. It is contended in behalf of Mrs. Machava
that such order likewise should have been made interlocutory
with respect to the issue of permanent disability. Instead of
so doing the commission determined that there was no
permanent disability.

Dr. Welsh testified that disability with respect to the
shoulder condition ended November 6, 1957, and that there
were no residuals therefrom. Dr. Evans testified that in
his opinion the accident of August 29, 1956, had not aggra-
vated the pre-existing heart condition. While Dr. Flood
had testified that it did, the commission had the right to
give the greater credence to such testimony of Dr. Evans.
Taken together, this testimony of Drs. Welsh and Evans
amply supports the finding of no permanent disability.

Because of the commission's having made such definite
finding it was prohibited thereby from entering an inter-
locutory order with respect to such issue. A contrary result

is plainly precluded by the rationale of our opinions in *Maynard Electric Steel C. Co. v. Industrial Comm.* (1956), 273 Wis. 38, 76 N. W. (2d) 604, and *California Packing Co. v. Industrial Comm.* (1955), 270 Wis. 72, 70 N. W. (2d) 200. In the *Maynard Case* we sustained an interlocutory order with respect to the issue of permanent disability because of the commission's express finding that a definite determination could not be made as to whether the applicant would have a greater permanent disability than then found. On the other hand, in the *California Packing Co. Case* this court set aside an interlocutory order because of the lack of credible evidence to sustain the commission's finding that it was uncertain whether the applicant might not in the future sustain renewed temporary disability or further permanent disability.

*Extent of Temporary Total Disability.*

In behalf of Mrs. Machava it is contended that the commission should have found that temporary total disability extended beyond November 6, 1957, and that the commission also should have made its order interlocutory as to the issue of the extent of the temporary total disability.

This contention is largely based upon some testimony elicited from Dr. Flood by the examiner after counsel had completed their direct examination and cross-examination of such witness at the December 9, 1957, adjourned hearing. Such testimony was as follows: Someone called Dr. Flood on the evening of December 3, 1957, and reported that Mrs. Machava seemed out of her head. This was because a neighbor had gone to the Machava home and found Mrs. Machava lying on the floor, clawing at the door, and crying. When the doctor arrived he found her lying on the couch and she recognized him but appeared to be confused and withdrawn. When he left the room she fell off the couch

with a tremendous shudder. Intermittently she shouted, "I want to go home. Why I have such pains?" She had experienced a similar attack on April 1, 1957, which at the time he had ascribed to her heart condition. Dr. Flood at no time had released her for work. It was Dr. Flood's opinion that she should be seen and evaluated by a competent psychiatrist.

There is no direct evidence in the record that such psychiatric manifestations were due to the accidental injury of August 29, 1956. The fact that Mrs. Machava had two of such mental attacks in 1957 about eight months apart does not establish that she had a mental condition which disabled her from work. As previously pointed out, the commission had the right to accept Dr. Evans' testimony that the accident had not aggravated the pre-existing heart ailment. If the heart condition is thus ruled out, the only injury sustained was the myofascial syndrome or traumatic myositis. The commission undoubtedly grounded the finding, that the temporary total disability ended November 6, 1957, upon Dr. Welsh's testimony that the myofascial syndrome had cleared up to the extent that he had released her for work on that date. There, therefore, was ample credible evidence to sustain the finding as to the termination date of the temporary disability.

Whether, because of Dr. Flood's testimony as to the mental outbreaks of April 1, 1957, and December 3, 1957, and his recommendation that she be examined by a psychiatrist, the commission should have made that part of the order relating to the extent of temporary disability interlocutory is a matter for the discretion of the commission. We cannot hold under the facts of this case that the commission exceeded its powers in failing so to do.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter a judgment affirming the order of the commission.