LEWELLYN, Respondent, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and another, Appellants.

*January 4—February 2, 1968.*

For the appellant Department of Industry, Labor & Human Relations the cause was argued by *Gordon Samuelsen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the appellant Briggs & Stratton Corporation there was a brief by *Brady, Tyrrell, Cotter & Cutler,* attorneys, and *Elwin J. Zarwell, Peter W. Bunde,* and *Michael J. Spector* of counsel, all of Milwaukee, and oral argument by *Mr. Spector.*

For the respondent there was a brief by *Habush, Gillick, Habush & Davis* and *Lawrence D. Gillick,* all of Milwaukee, and oral argument by *Lawrence D. Gillick.*

BEILFUSS, J.   We deem the determinative issues to be:

1. Did the commission make a finding that the disc herniation at the fourth lumbar intervertebral space did not occur as a result of the work incident on March 11, 1963 and, if so, is this finding supported by credible evidence?

2. Is an employee entitled to recover under the Workmen's Compensation Act when a preexisting degenerative condition becomes manifest in a normal nonstrenuous work activity without evidence of a definite "breakage?"

The findings of fact of the commission are as follows:

*"Findings of fact.*

"That the applicant was employed by the respondent for several years; that for about one year previous to March 11, 1963, she stamped blowers weighing about

5 lbs., 13 ounces; that on or about March 11, 1963, she felt pain in her back as she was about to straighten up from a bent over position approximately 20 minutes after having started work that day; that she reported to the respondent's first aid department shortly thereafter and was examined by Dr. Ansfield; that she had a degenerative disc condition which was not caused by or aggravated by her employment; that claimant did not sustain injury arising out of her employment with the respondent."

The commission's finding is not a model one in that it does not make mention of the herniated disc found and removed in 1964.

"If we considered this finding inherently ambiguous, insufficient or defective, we would agree with the trial court and send the case back for reconsideration. *Mrs. Drenk's Foods v. Industrial Comm.* (1959), 8 Wis. (2d) 192, 99 N. W. (2d) 172; *Johnson v. Industrial Comm.* (1958), 5 Wis. (2d) 584, 93 N. W. (2d) 439. We recommend to the commission it make more adequate findings, especially where it reverses the trial examiner." *Anheuser Busch, Inc., v. Industrial Comm.* (1966), 29 Wis. 2d 685, 689, 139 N. W. 2d 652.

While the findings should have specifically stated whether the disc herniation found in 1964 resulted from the work incident on March 11, 1963, failure to so state does not render the commission's finding fatally deficient under the circumstances presented here. Mrs. Lewellyn's position is that all of her compensable complaints arose from the March 11, 1963, incident. The only conclusion which can be drawn from the commission's findings is that the commission was convinced the herniated disc was not the result of the work incident. The commission's order completely reversed the examiners' findings which awarded compensation for the herniated disc and denied any benefits because they found the claimant did not sustain any injury arising out of her employment. Consequently, it must be determined whether

there was credible evidence upon which to base such a finding.

The testimony before the commission's examiners was in conflict. Dr. Ansfield, the company's doctor, testified that he did not think the 1963 incident could possibly produce a disc herniation such as the one found in 1964, except if the disc was "badly diseased and just broke down at that particular time but there is no X-ray evidence that the fourth lumbar interspace was abnormal." The X rays of 1963, the myelogram X rays, and the surgical procedure of 1964, showed a marked abnormality of the fifth lumbar interspace but no herniation of that disc.

Dr. Ansfield also testified as follows:

"*Q.* Do you have an opinion, Doctor, as to whether or not the herniation that was found on surgery above that point was the result of the incident that she described to you? *A.* Well, of course I was surprised to find a report that there was some protrusion of the disc at the fourth lumbar interspace. The fourth lumbar interspace on x-ray looks normal and in order to cause a disc herniation in a normal disc one would require a great deal of violence and there was no history of violence. Consequently I was very much puzzled over a report that the fourth lumbar interspace showed the protrusion."

Dr. Ansfield further testified that her March, 1963, complaint was pain in the lower back and right leg. He did observe muscle spasm and marked tenderness in the lumbosacral area and right buttocks area but these symptoms did not appear above at the L4–L5 area. The disc herniation found in 1964 was on the left side of the L4–L5 interspace.

Dr. Regan testified he was of the opinion the disc herniation occurred at the time of the work incident on March 11, 1963, and that this protrusion or herniation at the L4–L5 interspace was the cause of Mrs. Lewellyn's symptoms of March, 1963, and not the degenerative condition of the lumbosacral (L5–S1) joint. Further, Dr.

Regan testified that the ordinary X rays taken by Dr. Ansfield did not show the protruded disc condition and that this would not necessarily show up on the ordinary "AP and lateral" spine X ray, but it did show up on the special "myelogram" X ray taken by Dr. Regan.

In view of Dr. Ansfield's testimony and in view of the fact that Dr. Regan's examination and treatment of Mrs. Lewellyn took place approximately one year after the incident at work on March 11, 1963, and in view of the fact that there is evidence at least raising a reasonable inference that Mrs. Lewellyn purchased and rode a motor scooter shortly after the work incident, it cannot be said that the commission's conclusion that as of March 11, 1963, there was merely a degenerative disc condition at the lumbosacral joint was not based on credible evidence. As was said in *Conley v. Industrial Comm.* (1966), 30 Wis. 2d 71, 84, 85, 86, 140 N. W. 2d 210:

"Our statements and quotations in *Indianhead Truck Lines v. Industrial Comm., supra* (p. 565), as to scope of our review of the commission's finding of fact are apropos:

"If credible evidence exists in support of the commission's findings, such findings are conclusive. Sec. 102.23 (1), Stats. *Schuh v. Industrial Comm.* (1958), 2 Wis. (2d) 611, 614, 87 N. W. (2d) 256. As Mr. Justice HALLOWS put it in *Unruh v. Industrial Comm.* (1959), 8 Wis. (2d) 394, 398, 99 N. W. (2d) 182:

" 'The question is not whether there is credible evidence in the record to sustain a finding the commission did not make, but whether there is any credible evidence to sustain the finding the commission did make.'

"In *Borden Co. v. Industrial Comm.* (1958), 2 Wis. (2d) 619, 622, 87 N. W. (2d) 261, this court said:

" 'That testimony might have justified a contrary finding, but it is the function of the Industrial Commission and the examiners to evaluate medical testimony and determine its weight, and their findings on disputed medical testimony are conclusive. *Giant Grip Mfg. Co. v. Industrial Comm.* 271 Wis. 583, 74 N. W. (2d) 182.'

"Also, in *Glodowski v. Industrial Comm.* (1960), 11 Wis. (2d) 525, 530, 105 N. W. (2d) 833, we quoted the

following from *Hills Dry Goods Co. v. Industrial Comm.* (1935), 217 Wis. 76, 85, 258 N. W. 336:

" ' "If the commission finds against the great weight and clear preponderance of the evidence, or if it finds upon a given state of the evidence one way in one case and another way in another case, there being the requisite minimum evidence in each case, the matter is beyond the jurisdiction of this court." '

"In *Fitz v. Industrial Comm.* (1960), 10 Wis. (2d) 202, 205, 102 N. W. (2d) 93, we stated:

" 'The causal relationship between an injury and the disability presents a fact question for the commission.'

"In *Van Valin v. Industrial Comm.* (1962), 15 Wis. (2d) 362, 364, 112 N. W. (2d) 920, we stated:

"It is an elementary principle of law that the applicant has the burden of proof in a workmen's compensation case, and if the evidence before the Industrial Commission is sufficient to raise in the mind of the commission a legitimate doubt as to the existence of facts necessary and essential to establish a claim for compensation, it becomes the duty of the commission to deny the application on the ground that the claimant did not sustain his burden of proof. *Nielsen v. Industrial Comm.* (1961), 14 Wis. (2d) 112, 109 N. W. (2d) 483; *Fitz v. Industrial Comm.* (1960), 10 Wis. (2d) 202, 102 N. W. (2d) 93; and *Johnston v. Industrial Comm.* (1958), 3 Wis. (2d) 173, 87 N. W. (2d) 822."

The commission could find that Mrs. Lewellyn has not met her burden of proof to establish that the herniated disc at the L4–L5 interspace arose out of her employment on March 11, 1963.

The question remains whether Mrs. Lewellyn can recover for the period of temporary disability resulting from the degenerative disc disease which became manifest while she was at work on March 11, 1963. The commission found that Mrs. Lewellyn did have a degenerative disc condition but that such condition was not caused by or aggravated by her employment. The controlling statutory provision is sec. 102.03, which provides in part:

"**Conditions of liability.** (1) Liability under this chapter shall exist against an employer only where the following conditions concur:

"(a) Where the employe sustains an injury.

". . .

"(e) Where the accident or disease causing injury arises out of his employment."

It is undisputed that Mrs. Lewellyn did become disabled while engaged in the normal course of her employment. It was the opinion of Dr. Ansfield that Mrs. Lewellyn had a preexisting degenerative disc disease at the lumbosacral interspace which became symptomatic on March 11, 1963, while Mrs. Lewellyn was at work due to breakdown from the disease process. This, in Dr. Ansfield's opinion, was the cause of her disability at this time. His examination revealed objective and subjective evidence of discogenic disease at the lumbosacral junction, including marked narrowing of the lumbosacral interspace—which was of long standing—muscle spasm, and tenderness over the lumbosacral region and the right gluteal region.

Dr. Ansfield's narrative report on March 11, 1963, concludes:

"Summary and opinion: This patient has an acute low back derangement probably due to discogenic disease at the lumbosacral junction. As present she is disabled and is in need of treatment. The patient has a degenerated disc which became symptomatic in the course of her work on March 11, 1963, but it is my opinion that her symptoms were not the result of her work because on the basis of the patient's history she merely bent over and lifted a 7-pound article with her left hand and as she straightened up she got a severe catch in the lower back and shortly thereafter she developed radiating pain down the right lower limb. It is my opinion that that episode was not an adequate producing cause of low back trouble. The incident was not sufficient to be considered traumatic in nature and I feel that her symptoms are due to a diseased disc rather than to her work."

Part of Dr. Ansfield's testimony at the hearing was as follows:

"*Q.* And what was your opinion, Doctor, to a reasonable degree of medical certainty? *A.* Well, I felt that she had a degenerated disc that became symptomatic at the time that I saw her on March 11, 1963 due to a breakdown of a disease process. The physical effort that was involved was in my opinion not important because the amount that she lifted was not significant to produce any physical harm to the patient."

On cross-examination he explained:

"*A.* She became disabled in the course of her work, that's correct; but it is my opinion that it did not—she did not become disabled as a result of the work.

"*Q.* And the reason for your saying that is that you are of the opinion that there was not sufficient effort in what she did to produce it; is that correct? *A.* That's right. Not only not sufficient effort but some thing more. There was not sufficient effort which was capable of producing physical harm to this individual and nothing occurred such as any traumatic episode that produced harm to the patient."

It is clear there is credible evidence to sustain the commission's finding that the temporary disability was not caused or aggravated by the work activity of Mrs. Lewellyn. Consequently, the reviewing court is bound by the commission's determination according to the previously quoted rules of review. However, the evidence is clear beyond a doubt that Mrs. Lewellyn was engaged in some work activity when the degenerative condition became manifest. Consequently, there is presented a question of law which this court should decide.

The question is whether recovery should be allowed when a preexisting condition becomes manifest or symptomatic during normal activity where the activity bears some relationship to the manifestation.

Professor Larson, in his works *Law of Workmen's Compensation,* points out that a majority of jurisdictions

have recognized a distinction between a "breakage" and a "generalized" condition:

"A clear majority of jurisdictions now hold that when usual exertion leads to something actually breaking, herniating, or letting go, with an obvious sudden mechanical or structural change in the body, the injury is accidental. So we find an overwhelming majority compensating for hernia, and a substantial majority compensating for cerebral hemorrhage, arterial or blood-vessel rupture, ruptured aneurysm, apoplexy, ruptured appendix, herniated intervertebral disc, stomach rupture, dislocated kidney, dislocated cervical cord, and detached retina, even when the exertion or conditions producing the change were not out of line with the ordinary duties of the job." 1 Larson, Law of Workmen's Compensation (1952), p. 519, sec. 38.20, quoted with approval in *Wisconsin Appleton Co. v. Industrial Comm.* (1955), 269 Wis. 312, 323, 69 N. W. 2d 433; *Wisconsin Power & Light Co. v. Industrial Comm.* (1955), 268 Wis. 513, 517, 68 N. W. 2d 44; and *Brown v. Industrial Comm.* (1960), 9 Wis. 2d 555, 570, 101 N. W. 2d 788.

The Wisconsin cases indicate that where there is only usual effort expended ("usual" in the sense of exertions of normal nonemployment life rather than the usual exertion of the employee in his employment), and "breakage" occurs, recovery will be allowed.

A case where "breakage" was involved illustrates the point. The case, *Brown v. Industrial Comm., supra,* involved a bricklayer, who, while engaged in leaning out over a wall in order to line up the outer wall with the inner wall, experienced a sharp pain in his back. It was later determined that he had a herniated disc.[2] The commission dismissed the application, finding that the herniated disc was not accidental. The court said, at pages 569, 570:

---

[2] In *Brown, supra,* all three medical witnesses testified the disc herniated as a result of the work incident. In this case the medical witnesses disagree as to whether the work incident caused a herniation.

"An injury is 'accidental' whether caused by a usual or unusual exertion when the result is a herniation or breakage. *Wisconsin Appleton Co. v. Industrial Comm.* (1955), 269 Wis. 312, 322, 69 N. W. (2d) 433, and *Wisconsin Power & Light Co. v. Industrial Comm.* (1955), 268 Wis. 513, 517, 68 N. W. (2d) 44. . . .

"The fact, that the employee had a pre-existing diseased disc which was liable to herniate from even normal work effort as a bricklayer, does not relieve the employer from liability. An employer takes an employee 'as is' and if he is suffering from disease predisposing to 'breakage' and an exertion required by the employment causes the 'breakage' at the moment of exertion, the employer is liable under the act. *Wisconsin Appleton Co. v. Industrial Comm., supra,* and *M. & M. Realty Co. v. Industrial Comm.* (1954), 267 Wis. 52, 63, 64 N. W. (2d) 413.

"There is no burden upon the employee to show that the exertion being put forth at the time of the herniation was in any way unusual to his employment. In so far as the case of *Buettner v. Industrial Comm.* (1953), 264 Wis. 516, 59 N. W. (2d) 442, holds to the contrary, it is overruled."

Another example of a "breakage" case is *Indianhead Truck Lines v. Industrial Comm.* (1962), 17 Wis. 2d 562, 117 N. W. 2d 679. The employee, Conley, alleged that he "made a quick grab for an unloading hose, which slipped from his grasp; that such incident precipitated increased back symptoms; that applicant thereby sustained injury while performing service and in the course of his employment; . . ." Conley described the incident as a "quick action" in which he bent over to recover the hose. He testified that he noticed a "stretch or snap in the back." The court said, at page 567:

"We are satisfied that the commission could reasonably have determined that while Mr. Conley's previous history showed him to be predisposed to back difficulty and vulnerable to herniation of an intervertebral disc, such facts did not automatically relieve his employer from liability for an industrial accident which brought about a specific injury and subsequent surgery."

On the other hand, in cases involving a preexisting condition where no "breakage" was found to occur at the time of the alleged work incident, recovery has been denied.

In *Shawley v. Industrial Comm.* (1962), 16 Wis. 2d 535, 114 N. W. 2d 872, the employee, Shawley, was employed as a garbage and rubbish collector which required him to lift containers weighing from 50 to 400 pounds. While Shawley and another employee were carrying a 400-pound container up some stairs Shawley felt a pain in his left groin radiating into his lower back region. He underwent two operations to correct an indirect inguinal hernia and returned to work but found that he was unable to continue the work because of the back condition. He filed for workmen's compensation some months later alleging disability because of "arthritis of spine aggravated by trauma" occurring on the day of the above-described work accident.

The medical testimony was in conflict. One doctor testified the X rays revealed degenerative arthritis of the spine which was progressive, and it was his opinion that the work incident aggravated the condition but that the aggravation was only temporary and had since disappeared. Two other physicians expressed the opinion that Shawley's degenerative arthritis was aggravated by the accident and by the heavy lifting required by his employment and that he was totally disabled for manual labor which required lifting. This court held that the case was "a mine-run workmen's compensation case where the medical testimony is in sharp conflict." "Therefore," the court said, "a finding either way by the commission is conclusive on a reviewing court."

Former Mr. Chief Justice CURRIE, in discussing this case in his excellent article in 37 Wis. Bar Bulletin 7, 13 (February, 1964), comments:

"In these arthritic back cases, where it is claimed that there has been aggravation by trauma, there usually is

the fact question presented as to *whether the normal progression of the arthritis might not fully account for the present disability without the occurrence of the trauma."* (Emphasis supplied.)

In another case, *Van Valin v. Industrial Comm.* (1962), 15 Wis. 2d 362, 112 N. W. 2d 920, this court denied recovery to an employee who suffered severe pain in the back of the neck, in both arms, and in her leg, and broke out in a sweat, got chills and became nauseated when she pulled hard on a cord activating a switch on a machine she was operating. Subsequent surgery was performed to remove a ruptured cervical disc which was clearly the cause of these symptoms. In discussing this case Mr. Chief Justice CURRIE said:

"The commission on disputed medical testimony found this employee's complaints were due to causes wholly unrelated to the employee's employment and this court upheld such finding. Undoubtedly the significant evidence was the fact that she had had pain in her neck for some eight or nine months prior to the incident of July, 1959." 37 Wis. Bar Bulletin 7, 11.

Again, the evidence was sufficient to base a conclusion that the herniation or "breakage" did not occur at the time of the work incident, but the already "broken" condition or disease merely became manifest at that time.

From the preceding cases and others dealing with preexisting degenerative conditions, the following we feel represent an accurate appraisal of the factual situations which should determine whether or not the particular condition is recoverable:

(1) If there is a definite "breakage" (a letting go, a structural change etc., as described by Professor Larson), while the employee is engaged in usual or normal activity [3] on the job, and there is a relationship between the

---

[3] "Usual" and "normal" are used here and throughout the opinion in the sense of exertions of normal nonemployment life.

breakage and the effort exerted or motion involved, the injury is compensable regardless of whether or not the employee's condition was preexisting and regardless of whether or not there is evidence of prior trouble. *Brown v. Industrial Comm., supra,* and *Indianhead Truck Lines v. Industrial Comm., supra.*

(2) If the employee is engaged in normal exertive activity but there is no definite "breakage" or demonstrable physical change occurring at that time but only a manifestation of a definitely preexisting condition of a progressively deteriorating nature,[4] recovery should be denied even if the manifestation or symptomization of the condition became apparent during normal employment activity. *Shawley v. Industrial Comm., supra; Van Valin v. Industrial Comm., supra;* and Currie, 37 Wis. Bar Bulletin 7.

(3) If the work activity precipitates, aggravates and accelerates beyond normal progression, a progressively deteriorating or degenerative condition, it is an accident causing injury or disease and the employee should recover even if there is no definite "breakage." *Shawley v. Industrial Comm., supra;* Currie, 37 Wis. Bar Bulletin 7.

Considering, as we must, that there was no herniation of Mrs. Lewellyn's disc on March 11, 1963, nor employment-related aggravation of the preexisting condition, the case at bar falls into the second category above. There is sufficient credible evidence that there was no "breakage" and also sufficient credible evidence that the work incident did not aggravate beyond normal progression Mrs. Lewellyn's degenerative condition. Added to the evidence already discussed are company first-aid records which were introduced at the hearing. These indicate Mrs. Lewellyn complained of backache and strain to the back and left shoulder as early as May 26, 1960. This further supports the testimony that Mrs. Lewellyn was

---

[4] We are not here concerned with an occupational disease.

suffering from a degenerative condition which was progressively deteriorating until the onset of the severe symptoms on March 11, 1963. As indicated by the *Van Valin Case, supra,* evidence of prior trouble has high probative value on the question of extent of progression of a degenerative disease and the time and extent of aggravation or "breakage" if either is a question.

On the whole record there is sufficient credible evidence to support the commission's conclusions. Consequently, this court must sustain the commission's findings.

It might be noted that the concept of "breakage" by no means presents a clear-cut standard. As Professor Larson notes in sec. 38.73 of his works, *supra:*

"The gravest criticism that must be made of the attempt to draw a distinction . . . is that neither as a matter of medical theory nor as a matter of common sense can a line be drawn between internal failures which consist of something breaking and those which are 'generalized.' True, in a cerebral hemorrhage, a ruptured aorta or a 'slipped disc,' something breaks or lets go, and a mechanical structural change can be identified. But the commonest 'heart failure' case, that of coronary thrombosis, is also mechanical in that it consists of a 'plugging-up' action by a blood clot, an action which can be identified in space and time and which produces a structural change which can be observed. If one looks close enough in the 'generalized' cases, one will probably find some kind of disintegration or 'breaking,' although the pieces may be smaller than in cerebral hemorrhage or ruptured aorta; for example, in thrombosis there may be evidence of some hemorrhaging on a much more inconspicuous scale preceding the thrombosis. . . ."

The standard of "breakage" or other demonstrable physical change, even with its tenuous aspects, is desirable if there are to be any limits placed on recovery. It is true that the legislature contemplated broad construction of the act and public policy has appeared to

dictate expanded inclusion. The recent cases in the area have followed this course. Under *Brown, supra,* there only need be a "breakage" occurring while the employee is engaged in work or work-related effort. *Brown* is clear in its disposal of the concept that the effort expended must in some way be extraordinary or unusual. While the policy has been liberal inclusion, the Workmen's Compensation Act by virtue of the statute quoted above cannot become a blanket insurance policy to provide benefits for disabilities which may become manifest while on the job but are in no way caused by or related to the employment. To do so may not only make the costs of the program devastating but could adversely affect the employment possibilities of the aged, the handicapped, and anyone who is seeking a job who may have prior history of medical problems which might be subject to reoccurrence or progression, such as heart disease, strokes, arthritic or other degenerative conditions which commonly and usually accompany seniority.

As stated by Mr. Chief Justice ROSENBERRY, in *Newman v. Industrial Comm.* (1931), 203 Wis. 358, 360, 234 N. W. 495:

". . . the whole theory and purpose of the workmen's compensation act was to charge upon the industry as one of the necessary elements of cost in the production of goods, losses sustained by workmen in their employment. It was never intended to make the workmen's compensation law an accident insurance or health insurance measure. The original purpose and theory of the law is not infrequently lost sight of not only in cases of this character but in those where it is sought to extend the operation of the law to situations not fairly within its purpose and where its operation may very well do as much harm as it does good."

*By the Court.*—Judgment reversed with directions to reinstate the order of the Industrial Commission.