SWISS COLONY, INC., and another, Appellants, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, and another, Respondents.

*No. 675 (1974). Argued February 3, 1976.—*
*Decided April 7, 1976.*
(Also reported in 240 N. W. 2d 128.)

47

48

For the appellant there was a brief by *Axley, Brynelson, Herrick & Gehl* of Madison, and oral argument by *Griffin G. Dorschel.*

For the Department of Industry, Labor & Human Relations the cause was argued by *Gordon Samuelsen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general, concurred in by *William J. Schmitz* for respondent, Etha Schillinger, and oral argument by *Mr. Schmitz.*

WILKIE, C. J. The respondent Etha Schillinger received a workmen's compensation award for mental injury arising out of her employment by the appellant, the Swiss Colony, Inc. We affirm that award, which was sustained by the circuit court.

In 1955, Etha Schillinger commenced work for Swiss Colony, a mail-order cheese company located in Monroe, Wisconsin. She became the purchasing agent for this fast-growing company in 1961. This job subjected her

to numerous stresses and strains. In the spring of 1971 she began to feel "rattled" and "disorganized" and less able to withstand the mounting pressures of her job. In November of 1971 she consulted a physician and on November 7th was admitted to St. Clare Hospital in Monroe, suffering from weight loss, insomnia, exhaustion and depression. After staying in the hospital until November 18th she was released, but then was readmitted on November 29th in a psychotic state diagnosed as schizophrenia. She was again released on January 10, 1972, but did not return to work until October of that year. She then returned to work half time in a position of reduced responsibility and pressure. On January 2, 1973, she began to work full time in this reduced position.

Schillinger applied for workmen's compensation due to mental injury arising out of her employment at the Swiss Colony. Findings were entered that Schillinger became disabled by mental illness caused by the stresses and strains of her employment and that this illness constituted an accidental injury arising out of her employment. Permanent partial disability of 25 percent was also found, and jurisdiction was reserved in the event that Schillinger's condition further worsened. The department affirmed these findings of fact and interlocutory order on April 4, 1974. The circuit court subsequently affirmed the departmental findings and order, and the employer appeals from this judgment.

Two issues are raised on this appeal with respect to the basic workmen's compensation award. They are:

1. Was the claimant subject to stresses and strains which were out of the ordinary from the day-to-day stresses and strains which all employees must experience?

2. If so, did these out-of-the-ordinary stresses cause claimant's mental disability?

There is no question that there is abundant evidence in the record here that the claimant was subject to stresses and strains which were out of the ordinary from the day-to-day stresses and strains which all employees must experience. We held in *School District No. 1 v. ILHR Dept.*[1] that in order for nontraumatically caused mental injury to be compensable in a workmen's compensation case, the injury must have resulted from a situation of greater dimensions than the day-to-day mental stresses and tensions which all employees must experience.[2]

Our review of the record shows that there was ample credible evidence here to support a finding that Schillinger was exposed to work stresses which were out of the ordinary.

(1) *Nerve-racking nature of the job.*

Schillinger was the purchasing agent for a seasonal business which grew dramatically during the course of her employment. Her responsibility was for buying all packaging materials and food products (except for printing materials and cheese). The company grew from gross mail order sales of about two million dollars in 1961 to thirteen million dollars in 1971. Retail stores were added in the 1960's, and Schillinger did the purchasing for these stores until October, 1970. Although she had up to three employees working for her during this time, this did not diminish the pressures and strains, due to the growth of the business. Because Christmas catalogues were a main source of sales, the mail-order business was concentrated in the latter part of the year, although purchasing and delivery went on year round. Deadlines were standard operating procedure, and problems constantly arose because of machine breakdowns at

---

[1] (1974), 62 Wis. 2d 370, 215 N. W. 2d 373.
[2] *Id.* at pages 377, 378.

the suppliers, and trucks losing merchandise. The testimony of Raymond Kubly, Jr., Ruth Gibbons, and Schillinger clearly establishes that Schillinger's job was unusually nerve-racking and subjected her to greater pressures and tensions than those experienced by the average employee.

(2) *Critical and berating attitude of immediate supervisor.*

Ted Schneider was hired by Swiss Colony in July, 1970, as director of materials. He became the immediate superior of Schillinger, and the person with whom she had to be in close and daily contact. Ruth Gibbons, Schillinger's assistant, testified that Schneider was negative, brusque, and belittling, especially to women, and that he challenged and belittled any decision Schillinger would make. Gibbons also stated that this attitude upset Schillinger and made her unsure of herself. Schillinger testified that Schneider was abrupt and overly critical of her, and that she would make statements she knew were correct and he would contradict them. She stated that this was very frustrating and disheartening. In addition, the treating psychologist, Dr. Barnes, who was by coincidence the friend and next-door neighbor of Schneider, testified that Schneider was "a very aggressive man, somewhat cold in his dealings with other people, emotionally cold . . . brusque, very challenging, very critical," and that he may have overutilized and overburdened Schillinger.

In *School District No. 1* this court noted that an employee who suffered a mental injury "after being criticized and berated by an employer or whomever for a significant period of time"[3] should not be denied compensation. This case falls within that category. There is ample credible evidence that Schneider was critical and

---

[3] *Id.* at page 378.

berating toward Schillinger from at least January 1, 1971, until her breakdown on October 29, 1971, after a final incident of abrupt, brusque criticism by Schneider.

(3) *Long hours and no vacations in 1971.*

Schillinger testified that she was probably working more hours in 1971 than she had in any previous period. Two credible reasons appear of record for these extra burdens. First of all, there was a turnover of employees in the purchasing department in 1971. Schillinger was responsible for training the new employees, and also had to perform the duties they were as yet unable to perform. She also testified that she had to come in after hours in order to correct the errors they had made. The second reason for extra burdens and extra hours was a new purchasing procedure introduced by Schneider in the summer of 1971. This consisted of drafting and utilizing a set of form letters to various suppliers requesting price information on commodities which were to be purchased. Although the ultimate objective of this new system was to economize on time spent on such communications, Schillinger testified credibly that at the outset the new system was more time-consuming than the old one and added to her burdens. Gibbons also testified that Schillinger was laboring under an unusually heavy workload in the summer and fall of 1971. She stated that Schillinger worked more than fifty hours a week, and took work home at night regularly. Even Schneider admitted that Schillinger was working more than forty hours a week, and that she did take work home at night.

In addition, it is undisputed that Schillinger did not take a planned one-week vacation in May, 1971, and another one-week vacation in July, 1971, because of the press of work. The May vacation was cancelled at the request of Schneider because of a production problem that had developed. Schillinger did not take her July

vacation because an employee had left the purchasing department and she had to train the new employee.

There is thus credible evidence that throughout the summer and fall of 1971 Schillinger was laboring without respite under an unusually heavy workload.

The circuit court did not consider *School District No. 1* to be applicable to the facts of this case for the reason that in this case, unlike *School District No. 1*, there was involved "an underlying weakness or quiescent disease." This "deteriorating mental disease" was, in the circuit court's view, identical to a "deteriorating disc disease," and so the same standards should be applied to both situations. Thus the circuit court upheld the departmental award by applying the *Lewellyn* rule[4] to this case:

"... If the work activity precipitates, aggravates and accelerates beyond normal progression, a progressively deteriorating or degenerative condition, it is an accident causing injury or disease and the employee should recover even if there is no definite 'breakage.' ..."[5]

The *Lewellyn* rule is inapplicable to this particular case of mental injury. *Lewellyn* clearly stands for the proposition that there is a compensable injury caused by an accident where there is "a definitely preexisting condition of a progressively deteriorating nature"[6] and the work activity precipitates, aggravates or accelerates this condition beyond normal progression. In Schillinger's case there is no indication at all that she had previously suffered any kind of mental disease or debility. On the contrary, all of the evidence in the record indicates that she had been in normal mental health until her gradual decline and eventual breakdown in October 1971. It is

---

[4] *Lewellyn v. ILHR Dept.* (1968), 38 Wis. 2d 43, 155 N. W. 2d 678.

[5] *Id.* at page 59.

[6] *Id.*

true that, as both psychiatrists and the psychologist testified, mental health specialists believe that all schizophrenics have a genetic predisposition to this condition, although an examination of Schillinger's family history revealed no mental problems of this type. But this mere predisposition or propensity is not the definitely preexisting, and progressively deteriorating condition envisioned by *Lewellyn*. The condition of schizophrenia does not exist until it is created by life stresses, and in this case it did not exist at all until Schillinger's gradual decline and breakdown in the fall of 1971. This is not a case where there is a history or evidence of prior mental or mental-physical disabilities later aggravated by work stresses. Therefore, the *Lewellyn* rule was erroneously applied to the facts of this case.

The circuit court was also incorrect in concluding that the exact same standards should be applied to cases of mental and physical injuries. This court held in *School District No. 1* that, in cases of nontraumatically caused mental injuries, the special guidelines of that case must be followed. Thus, for example, out-of-the-ordinary work stresses must be shown in order for the claimant to recover. The policy of caution and carefulness announced in that case would be frustrated if these guidelines were abandoned and the standards for physical injuries applied to this case.

Counsel for the appellants point out that the department did not specifically find that Schillinger was subject to extraordinary work stress. This is true. The department found:

"That the applicant became disabled by mental illness which was caused by the stresses and strains of her employment; that the applicant's mental illness was caused by an accidental injury arising out of her employment; that the applicant's last day of work was October 29, 1971 which is the date of injury."

But the department here merely affirmed the findings of the hearing examiners, which were entered by the hearing examiners well before the *School District No. 1* case and affirmed by the department after that decision was announced. It is therefore reasonable to assume that the department had the *School District No. 1* decision in mind and that a precise finding that the "stresses and strains" of Schillinger's employment were out of the ordinary can be inferred. In previous cases this court has similarly construed departmental findings when it seemed obvious that they were intended and when they were consistent with the final result.[7]

The department specifically found that the stresses and strains of Schillinger's employment caused her severe mental disability. The determination of the cause of a disability is a question of fact, and departmental findings in regard to causation are conclusive upon this court if supported by credible evidence.[8] In this case the question of causation depended upon medical testimony, and it is the function of the department, not this court, to weigh and evaluate conflicting medical testimony.[9]

There is extensive credible evidence in this case that the cause of Schillinger's mental disability was the unusual work stress which she was subject to in 1971. Dr.

[7] *Lewellyn v. ILHR Dept., supra,* footnote 4 (finding of no injury arising out of employment construed to include finding that later herniated disc was not the result of a work incident); *Anheuser Busch, Inc. v. Industrial Comm.* (1966), 29 Wis. 2d 685, 689, 139 N. W. 2d 652 (finding that there was a hernia construed to include finding that hernia was traumatic rather than occupational).

[8] Sec. 102.23 (1), Stats. *Transamerica Ins. Co. v. ILHR Dept.* (1972), 54 Wis. 2d 272, 276, 195 N. W. 2d 656; *Reich v. ILHR Dept.* (1968), 40 Wis. 2d 244, 262, 161 N. W. 2d 878.

[9] *Worsch v. ILHR Dept.* (1970), 46 Wis. 2d 504, 512, 175 N. W. 2d 201, and cases there cited.

Kamstra was Schillinger's admitting psychiatrist, and he visited her regularly, at times twice a day, during the course of her mental illness. He testified that this work stress was the "major contributing factor" to Schillinger's mental disability. He further testified that, if this unusual work stress was not present, Schillinger would not have experienced her mental breakdown. Schillinger had had difficulties with her husband, especially in 1968–1969, mainly because of his weakness for alcohol, but Dr. Kamstra discounted these prior difficulties as "a minor stressful situation" in 1971. He testified that the claimant would not have suffered her disability because of her marital problems alone, and that she would have experienced a breakdown regardless of her marital situation. Schillinger's treating clinical psychologist, Dr. Barnes, also saw Schillinger on a daily basis during her acute disability, and quite regularly after her release from the hospital. He testified that the work stress was the principal cause and major factor in her mental breakdown, "far outstripping" all other factors. In addition, Schillinger testified that work stress, and not her marital situation, was the cause of her breakdown. Gibbons also testified that she could observe that these various work stresses were "destroying" Schillinger, and that in the fall of 1971 Schillinger was happy and optimistic about her marital situation. Finally, it is undisputed that the actual precipitating factor of Schillinger's initial breakdown on October 29, 1971, was a work-related incident with Schneider.

There is no question that there is credible evidence to support the findings as made by the department.

Although there was contrary medical evidence offered by the employer's psychiatrist, Dr. Leigh Roberts, to the effect that Schillinger was not really subject to any unusual stresses and that the true cause of her psychosis was her marital difficulties, this court need not consider

this evidence because the department is the proper agency to weigh medical testimony. We need only be satisfied on this point that there is credible evidence to support the findings as actually made by the department.[10]

The final issue raised on this appeal is whether there is credible evidence to support the departmental finding of 25 percent permanent partial disability. The testimony of Dr. Kamstra clearly supports the department's determination. The appellant contends that Dr. Kamstra's testimony does not support the finding. But the appellant's brief in this respect is incomplete. For example, appellant states "there was no testimony in the record that the 25 percent measured the extent of the impairment of the earning capacity." Yet Dr. Kamstra clearly and unequivocally testified that his finding of 25 percent permanent partial disability was based upon "the impairment of earning capacity." He explained that he had made such a conclusion because when a schizophrenic like Schillinger improves so that she can return to society, she does so "with a reduced ability to function in society." It was this "reduced functioning" due to Schillinger's mental condition which was the basis of Dr. Kamstra's conclusion of 25 percent permanent partial disability. Dr. Kamstra also testified that when one spoke of recovery for schizophrenics like Schillinger, "recovery does not mean cure, it means improvement." It was probable, in Dr. Kamstra's estimation, that Schillinger would require medical treatment for most of the rest of her life. Although she has gradually returned to full-time work at Swiss Colony, she is no longer the purchasing agent. She is a "buyer B," a position of reduced responsibility.

There is ample credible evidence in the record to support the department's finding of 25 percent permanent

---

[10] *Transamerica Ins. Co. v. ILHR Dept.*, *supra*, footnote 8, at page 276; *R. T. Madden, Inc. v. ILHR Dept.* (1969), 43 Wis. 2d 528, 549, 169 N. W. 2d 73.

partial disability. The determination of the nature and extent of a disability are questions of fact, and the departmental findings in this regard are conclusive if supported by any credible evidence.[11] The department is the judge of the weight and credibility of medical witnesses testifying on the question of permanent partial disability.[12] The department, as the trier of fact, has the right to accept the treating physician's testimony as to the existence and degree of a permanent partial disability.[13]

Swiss Colony argues that a determination of permanent partial disability was premature because Schillinger's healing period had not yet ended. The phrase "healing period" was defined as follows in *Johnson v. Industrial Comm.*:[14]

"The healing period applied to mental harm . . . would be the period prior to the time when the mental condition becomes stationary and would require a postponement of fixing permanent disability, if any, to the time when it becomes apparent that the mental condition . . . will become no better or worse."[15]

In *Johnson* the court held that the claimant's healing period for mental harm had not ended because he had not yet been treated for his traumatic neurosis and because treatment might cure his mental disability. In this case Schillinger was treated extensively for her mental disability and released from the hospital. This treatment improved her condition to the point that she could return to work. Her mental condition was sufficiently "station-

---

[11] *Transamerica Ins. Co. v. ILHR Dept.*, *supra,* footnote 8; *Reich v. ILHR Dept.*, *supra,* footnote 8.

[12] *Semons Dept. Store v. ILHR Dept.* (1971), 50 Wis. 2d 518, 184 N. W. 2d 871.

[13] *Kohler Co. v. ILHR Dept.* (1969), 42 Wis. 2d 396, 407, 167 N. W. 2d 431.

[14] (1958), 5 Wis. 2d 584, 93 N. W. 2d 439.

[15] *Id.* at page 593.

ary" to permit an appraisal of permanent partial disability. The fact that she still required medical treatment after her return to work should not bar a determination of permanent disability, since if this were the rule no determination of permanent disability could ever be made for a mental or physical disability as long as the claimant required continuing medical attention.

*By the Court.*—Judgment affirmed.